Timothy J. Conway, OSB No. 851752
　Direct Dial: (503) 802-2027
　Email: tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
　Direct Dial: (503) 802-2169
　E-Mail: michael.fletcher@tonkon.com
Ava Schoen, OSB No. 044072
　Direct Dial: (503) 802-2143
　Email: ava.schoen@tonkon.com
Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
Main: 503.221.1440
Facsimile: 503.274.8779

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Van's Aircraft, Inc.,<br><br>　　　　Debtor. | Case No. 62260-dwh11<br><br>**DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS** |

I, Clyde A. Hamstreet, declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief, that I am competent to testify to the matters stated herein, and that I understand they are made for use as evidence in court and are subject to penalty for perjury.

1.　I, Clyde A. Hamstreet, through Hamstreet & Associates, LLC ("Hamstreet"), was retained by Van's Aircraft, Inc. ("Debtor" or "Vans") to provide financial and business consulting services.

2.　I am a Certified Turnaround Professional and have served in leadership positions of the Northwest and National Turnaround Management Associations and the Association of Turnaround Professionals. I have been nominated for turnaround practitioner of the year four

Page 1 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
　　　　　　　IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11　Doc 15　Filed 12/04/23

times, winning the award in 1994, 2005 and 2011. In 2009, I was honored by the Northwest Chapter of the Turnaround Management Association "for [my] dedication and outstanding professional achievements in business restructurings and turnaround" at its 10th Anniversary Cross-Border Conference.

3. I have expertise in corporate finance, management, and governance, and have held management positions in many corporations, including Chief Restructuring Officer, Chief Executive Officer, President, Chief Financial Officer, and Director. I have successfully restructured large and mid-size companies and have led many initiatives to restore underperforming corporations to profitability, both in and out of Chapter 11. My experience includes the strategic repositioning of core operations, complex refinancing and investment arrangements, aggressive cost reductions, intensive management of working capital, and sales and divestitures. I have advised corporate boards on improving governance processes and creating more effective relations between board and management. I have extensive experience in bankruptcy and other legal settings, serving as an expert witness in numerous federal cases and multi-million dollar arbitration matters.

4. I submit this declaration in support of Debtor's various motions and applications filed with the court contemporaneously herewith. Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge; my review of relevant documents; or my opinion based upon my experience, knowledge, and information concerning Debtor's operations and financial affairs. If called upon to testify, I would testify to the facts set forth in this declaration.

5. On December 4, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. The Chapter 11 will allow Debtor to stabilize its finances for the future.

Page 2 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

## BACKGROUND OF VAN'S AIRCRAFT

6. Van's is a kit aircraft manufacturer, founded in 1972 in Reedville, Oregon, by Richard "Van" Van Grunsven. The Van's RV series of aircraft are all-aluminum, low-wing monoplanes of monocoque construction. As of October 2023, over 11,000 RV kits have been reported as completed and flown by customers, with thousands more under construction, making the RV series the most numerous of all homebuilt aircraft.

7. RVs are deemed Experimental Amateur Built (EAB) aircraft by the Federal Aviation Administration in the United States and are accepted under the corresponding category by the aviation authorities in many other countries, including the United Kingdom, Canada, New Zealand and Australia. The EAB designation has been in existence for more than five decades and defines aircraft that are used for non-commercial, recreational purposes such as education or personal use. Numerous aircraft designs are available to purchase in plans, or kits (where some of the airplane is already fabricated), such as those by Van's Aircraft. Under FAA regulations, if one or more amateur builders complete at least 51 percent of such an aircraft, it is eligible to be registered in the amateur-built category. EAB airplanes are also commonly known as "homebuilts," as many individuals construct these aircraft at home, often in their garages. Currently, more than 33,000 amateur-built/homebuilt aircraft are licensed by FAA.

8. Van's is considered the leader in the homebuilt aircraft industry by independent sources and it has a very loyal base of followers, customers, and private pilots looking for reasonably priced, safe and reliable alternatives to more expensive certified aircraft.

9. Debtor's aircraft factory is currently located in two buildings. The main building and corporate offices are in a 60,000 square foot facility located on approximately 8 acres; a nearby second building housing engineering and technical design teams, workshops and hanger space is located on a smaller parcel; both buildings are sited at the south end of the Aurora State Airport in Aurora, Oregon. Van's currently has approximately 110 employees.

Page 3 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

10. The founder, Mr. Richard Van Grunsven, established an ESOP in approximately 2003, and over time, turned management and operations over to Van's employees. Mr. Van Grunsven, who is now in his 80s, has been essentially retired from Van's. However, the management team recently made him aware of the dire financial situation of the company and he has come in to do all he can to rescue Van's from this financial crisis for the long-term benefit of its customers, employees and vendors.

11. On or about August 10, 2021, Mr. and Mrs. Van Grunsven loaned Van's $6,500,000 secured by a deed of trust on the main building and corporate offices. On or about September 29, 2022, Mrs. Van Grunsven loaned Van's $650,000 for the purchase of a Trumpf 5000 punch press. On or about September 18, 2023, an additional $1,000,000 loan was made secured by the second building housing the engineering and technical design team, workshops and hanger space. Shortly thereafter, an additional $500,000 loan was made on an unsecured basis. Finally, on or about October 30, 2023, an additional $2,000,000 loan was made to Van's secured by all real and personal property of the company. Prior to the Petition Date, as part of their estate planning, Mr. and Mrs. Van Grunsven transferred their interests in the loans due and owing from Van's to The Richard E. Van Grunsven and Diane E. Van Grunsven Trust (the "Trust"). These pre-petition loans are all loans from an insider or affiliate. The Debtor will also be seeking court approval for a post-petition loan from the Trust in an amount up to $6,000,000 to help fund post-petition operations, which loan will have an option by the Trust to be converted to equity at confirmation of a Plan of Reorganization.

**EVENTS LEADING TO BANKRUPTCY**

12. Until recently Van's operated successfully without bank loans or other lines of credit, relying on customer deposits and earnings for its working capital. But prior to the Petition Date, a combination of unforeseen, significant events occurring over a relatively short period of time increased Debtor's costs, doubled its normal inventory levels, slowed deliveries, and strained Debtor's cash flow to the breaking point. Since early September, Debtor has only been

Page 4 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

able to continue operating through loans of operating capital made by Mr. and Mrs. Van Grunsven. Below is a table of key metrics showing effects of the pandemic on Van's business.

| Van's Aircraft Key Metrics | 2019 | 2020 | 2021 | 2022 | 8/31/2023 YTD |
|---|---|---|---|---|---|
| Number of Kits Ordered | 1,594 | 2,508 | 3,982 | 2,292 | 1,428 |
| SLSA Ready Fly Aircraft Delivered | 8 | 11 | 11 | 20 | 25 YTD |
| Revenue | $ 31,504 | $31,148 | $37,644 | $52,612 | $ 43 |
| Net Income | $2.60 | $3.00 | $2.10 | ($3.30) | ($1.00) |

13. On October 27, 2023, Debtor undertook a three-week focused internal assessment of inventory, production, and shipping capabilities, and overall operating efficiencies. At the same time, Debtor reviewed its costs to determine what its kit pricing needs to be to operate profitably going forward.

14. As with many businesses, the pandemic placed a financial strain on Debtor. Some of its senior employees with deep familiarity with both office and manufacturing process workings chose to retire during Covid. Van's order file doubled in the 2020 and 2021 period. At the same time, supply chain issues, and supplier shutdowns slowed productions of key components, increasing back orders and delaying order completions, requiring Debtor to hire and train more staff. Wages increased, and shipping costs rose more than four-fold during this period. Stated simply, without realizing it, Debtor was selling a high volume of aircraft kits below its cost. The combination of all these factors overstressed Van's workforce, operating support systems and management skills resulting in a series of one-off but very costly errors.

15. The first one-off event came during Covid when an overseas contractor was unable to source its usual primer paint and used an inferior product, resulting in aluminum corrosion forming on many quick build aircraft kits. This required Debtor to scrap many kits,

Page 5 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

while further increasing production to replace affected kits. This was a multi-million-dollar setback for Debtor.

16. The second one-off event occurred as the Debtor fell behind on shipping orders, and made the decision to outsource some aluminum parts manufacturing, which increased the manufacturing costs for those parts. The only timely option was to have some parts laser-cut rather than computer numerically controlled (CNC) punched. After many of these laser-cut parts had been shipped, the Debtor received reports from customers that they were observing small cracks at the edges of some holes on these parts. Debtor researched the issue and engaged in extensive testing. The information communicated to customers about what should or would be done about this issue changed as Debtor's research and testing revealed that many of the affected parts still met Debtor's design requirements. Although Debtor's testing proved that laser-cut parts are functionally equivalent to CNC-punched parts in most cases, the belief set in among many builders that they are unsuitable for use. This resulted in an unmanageable number of requests to replace laser-cut parts and cancel orders. More than 1,800 customers are currently affected by this issue, some of whom have received more than one kit.

17. Since October 27, 2023, Debtor has been evaluating all reasonable means of satisfying builder concerns regarding laser-cut parts and formalizing its program for getting replacement parts to builders. While the actual cost of mitigating the issue is unknown, a contingency reserve of $5 million was added to the Debtor's November balance sheet for this program.

18. The once normal order production manufacturing processes became less efficient with the spike in increased orders; inventory doubled from historical levels; and great costs were incurred attempting to replace both corrosion and laser cut parts impacted products and components. All of this contributed to the rapid consumption of Debtor's cash, leading to its liquidity crisis. While portions of the cash were consumed funding operational and one-off

Page 6 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

losses, a larger portion went into increased inventory levels that will convert to cash as excess inventory is sold in the ordinary course of Van's business over the next 18-24 months.

19. Promptly after filing its Chapter 11 petition, Debtor filed certain applications, motions, and proposed orders (the "First Day Motions"). Debtor requests that orders for each of the First Day Motions be entered, as each constitutes a critical element in achieving a successful reorganization of Debtor for the benefit of all parties-in-interest.

20. In particular, Debtor requests that its (a) Motion for Temporary and Final Authority to Use Cash Collateral; (b) Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Compensation, Expenses, Benefits, and Related Taxes; and to Continue Employee Benefits Postpetition; (c) Motion for Order Authorizing Supplemental Notice of Claims Bar Date; (d) Precautionary Motion for Authority to Hold Customer Post-petition Deposits in Trust Account; (e) Omnibus Motion to Reject Customer Contracts Unless Otherwise Agreed and Establish Procedures Therefore; (f) Application to Employ BMC Group, Inc. as Debtor's Noticing and Claims Agent and to assist in the management of contract modification tracking; and (g) Motion for Order Authorizing Debtor to Obtain Secured Credit on an interim basis (collectively, the "Expedited First Day Motions") be heard by the Court on an expedited basis.

21. Debtor is in immediate need to obtain Court consideration and approval of its Expedited First Day Motions in order to continue to conduct its business in the ordinary course and to pay its post-petition obligations as and when they become due. Debtor will suffer immediate and irreparable harm if it is not authorized to obtain the relief requested in its Expedited First Day Motions. Debtor requests that a hearing be set on the Expedited First Day Motions as soon as reasonably possible.

## REJECTION OR MODIFICATION OF CUSTOMER CONTRACTS

22. Debtor was party to over 3,500 executory contracts which consist of customer's orders for various items including, without limitation, kit order agreements, engine order

Page 7 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

agreements, propeller order agreements, avionics order agreements, miscellaneous parts orders, and aircraft purchase and deposit agreements (collectively, "Customer Contracts"). The Customer Contracts are key to the success or failure of Debtor's business. The pre-petition Customer Contracts contain pricing that Debtor cannot perform.

23. Notwithstanding the unprofitable nature of the pre-petition Customer Contracts and the Debtor's need to reject them, Debtor does want to offer its customers of certain products the ability to agree to modify their purchase agreement and apply their present deposits to the purchase of the same items at new increased pricing. The new pricing structure is necessary to allow Debtor to sustain its operations.

24. In turn, Debtor seeks authority pursuant to its Omnibus Motion to Reject Customer Contracts and Establish Procedures ("Rejection Motion") to (a) modify the limit set out in Bankruptcy Rule 6006(f)(6) and (b) implement the Rejection Procedures described in the Rejection Motion.

25. Customers with open kit orders that were placed prior to the filing date will be contacted regarding pricing changes that Debtor will be implementing. These customers will be sent an email directing them to a web-link where they can view and act upon the details of their existing order, the amount of their deposit, and Debtor's proposed modifications. Debtor is offering to apply the full dollar amount of previously remitted deposits and payments to modified kit orders. Customers with kit orders not agreeing to the changes proposed will be terminated as of January 15, 2024.

26. Customers with open engine, propeller and avionics kit orders will be contacted in a similar manner, but at a later date following discussions with these third-party suppliers, when Debtor has a clearer picture for timing of product delivery and treatment of their deposit.

## CUSTOMER DEPOSITS TO BE HELD IN TRUST

27. Debtor receives deposits from customers in connection with the purchase and sale of parts, aircraft kits, and completed aircrafts ("Customer Deposits"). The general practice has

Page 8 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

been to use Customer Deposits and payments to fund company operations and the production of parts and kits upon receipt. However, on October 6, 2023 and October 12, 2023, notices were inadvertently sent to customers asking for final payment for kits that were not yet ready to be delivered. Mistakenly, a number of customers with orders that were not going to ship until 2024 were asked to pay their deposit. As a result of the inadvertent notice, Debtor commenced a policy that it would take all Customer Deposits received from and after October 6, 2023, and place them in a separate bank account to be held in trust for the benefit of those customers who remitted payment (the "Deposit Practice") as opposed to the prior practice where the Customer Deposits were immediately made available and used for operations of the company. Pursuant to the new Deposit Practice, Customer Deposits received after implementation of the Deposit Practice are presently held in a separate account at Key Bank ("Customer Deposit Account").

28. The new Deposit Practice provided that the Customer Deposits would be held in the Customer Deposit Account until the time the parts, aircraft kits, or completed Aircraft was ready for production. At that point, the customer would be provided a Notice of Commencement of Production stating that their kit was in the process of being produced and assembled. At that time, the funds would be released from the Customer Deposit Account and transferred to the Debtor's general fund to be used for the production of the product. If the customer requested a refund prior to the Notice of Commencement of Production, the customer's funds in the Customer Deposit Account would be returned to the customer. The Debtor intends to offer this Deposit Practice during the pendency of the Chapter 11 proceeding to provide additional assurance to prospective customers that their deposits for new orders will be protected during the pendency of the bankruptcy process.

29. Post-petition funds received by customers who place new orders after the Petition Date will have their funds placed in the Customer Deposit Account and held in trust pursuant to the terms of the new order agreements. Those funds will remain the property of the customer who placed the deposit and will only become property of Debtor's estate after the Debtor

Page 9 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
   IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 15    Filed 12/04/23

provides the customer a Notice of Commencement of Production or as otherwise set forth in the new order agreement, at which time the funds will be moved from the Customer Deposit Account to the Debtor's general operating account and applied towards the purchase price of the product.

30. During the pendency of the Chapter 11 proceeding the Debtor intends to offer this Deposit Practice and other constraints on its use of customer deposits, which are outlined in greater detail on Van's new customer order agreements ("New Deposit Practice"). Debtor's placement of customer deposits into a trust account will protect and reassure customers and enable Van's to better accept orders and operate its business in the ordinary course and maintain the going concern value of its business.

## CASH COLLATERAL AND POST-PETITION FINANCING

31. Debtor needs authority to use cash collateral and incur post-petition debt to enable it to continue the operation of its business in an orderly manner, and preserve and maintain the going concern value of its business for the benefit of all of its creditors and its estate. Its bi-monthly payroll and benefits exceed $340,000. Sales and administrative expenses vary between $100,000 and $125,000 per week. In addition to the normal operating expenses, Debtor projects it will be required to make up to $25,000 of utility deposits. It is essential that Debtor's customers remain confident that Debtor will offer the products they expect. The Trust holds a blanket lien on Debtor's personal property, which was perfected by filing a UCC financing statement in all personal property assets of the Debtor.

32. In order to fund its ongoing operating expenses, avoid the possibility of a disruption in the timely and efficient manufacture delivery of aircrafts and aircraft kits, and make the required utility deposits, Debtor will need authority to use cash collateral and obtain post-petition financing to ensure that it is able to continue its business as usual pending a final hearing on its cash collateral motion. Debtor has prepared a 13-week budget setting forth the amounts

Page 10 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 15    Filed 12/04/23

necessary for Debtor's continued operations, attached to the Motion for Temporary and Final Authority to use Cash Collateral as Exhibit 1.

33. To provide adequate protection for the use by Debtor of the Trust's cash collateral, Debtor proposes that the Trust be granted (i) a replacement security interest in and lien upon Debtor's assets generated or acquired from and after the Petition Date of the same category, kind, character, and description as were subject to the Trust's lien on the Petition Date (the "Replacement Lien") and (ii) an allowed administrative expense claim under Section 503(b) of the Bankruptcy Code that will have super priority as provided in Section 507(b) of the Bankruptcy Code against non-exempt property of the Debtor's estate (real and personal, tangible and intangible), whenever acquired. The Replacement Lien shall be junior to the lien and provisions of the order approving the Credit Motion with respect to the post-petition loan from the Trust, including the carve-out provisions thereof. The adequate protection granted to Trust shall not enhance or improve the position of the Trust with respect to its pre-petition debt.

34. Additionally, Debtor will need authority to incur post-petition debt in an amount up to $6,000,000. The Trust has agreed to provide post-petition financing as set forth in Exhibit 2 to the Motion for Order Authorizing Debtor to Obtain Secured Credit ("DIP Facility"). The Trust, upon court approval, will make optional advances in amounts totaling up to $6,000,000, which advances will accrue interest at 9.75% per annum and be payable on the earlier of the (a) Effective Date of any plan of reorganization confirmed in the Bankruptcy Cases, (b) date of the entry of an order converting this Bankruptcy Case to a case under Chapter 7, (c) date of the entry of an order appointing a trustee under Chapter 11, or (d) May 31, 2024. Debtor anticipates, it may need to borrow up to $2,000,000 on an interim basis pending a final hearing on the DIP Facility.

35. Pursuant to the DIP Facility, the Trust shall have an unsecured administrative claim that will be subject and subordinate to (a) unpaid fees of the U.S. Trustee and (b) unpaid

allowed administrative expense claims for professional fees and expenses incurred prior to the entry of any order converting this case to a case under Chapter 7 of the Bankruptcy Code.

36. Debtor is unable to obtain adequate financing on equal or more favorable terms than those offered by the Trust. DIP lenders prefer to loan against accounts receivable and inventory, assets that can easily be liquidated for repayment in the event of default. Typical advance rates might be 80% to 85% on current accounts receivable and 30% to 60% of inventory liquidation value and 50 to 60% of liquidation value of machinery and equipment. Debtor has no accounts receivable; its inventory's liquidation is estimated to be very low, mostly the value of scrap aluminum would be of little interest to its lender. The Debtor does have machinery and equipment with a liquidation value of $2.0 million resulting in an advance rate of $1.2 million. I believe the few DIP lenders that would consider loaning Van's $6 million would require high loan fees and interest rates of 13 to 15%. My firm recently assisted a current client obtain formal quotes from two DIP lenders, one September 5, 2023, and the other October 25, 2023. That Client has high quality accounts, and fast turning inventories. The all-in annual cost of interest and fees of one quote was 13% plus $50,000 closing cost. The other quote all in annual cost was 17.5% with closing cost of $12,500.

37. The proposed terms and conditions in the DIP Facility are the best that are available to Debtor.

38. Debtor's authority to use cash collateral and borrow money is necessary to avoid immediate and irreparable harm to the estate. Without approval of Debtor's motions, Debtor will be unable to maintain and preserve its business operations and provide necessary and appropriate assurances to all vendors, suppliers, customers, and creditors that it will be able to maintain and preserve its assets and effectuate an orderly and efficient reorganization. Absent the Court's approval of these requests, Debtor will confront a disruption of its business operations that would have a material and adverse effect on Debtor's operations to the detriment of Debtor, its creditors, and its estate.

Page 12 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 15    Filed 12/04/23

39. Debtor's use of cash collateral and incurrence of post-petition debt will not harm the interests of any creditor because the use of such cash and the incurrence of such debt will enable Debtor to operate its business in the ordinary course and maintain the going concern value of its business.

**PRE-PETITION WAGES**

40. Debtor employs approximately 110 employees.

41. Debtor pays employees on a bi-monthly basis on the fifth day after the 15th of each month and the fifth day after the last day of each month. However, last month employees were paid in full for work through November 30, 2023.

42. Debtor has an average payroll of approximately $340,000 per pay period.

43. All of Debtor's employees receive payment by electronic transfer except for eight employees who receive paper checks.

44. Because the Petition Date is December 4, 2023, Debtor has incurred unpaid prepetition obligations for wages, salaries, expenses, commissions, and other employment compensation and benefits for the period December 1, 2023 to December 4, 2023.

45. The total amount Debtor is obligated to pay for accrued and unpaid prepetition wages, salaries, expenses, commissions, compensation, taxes, and benefits for the period December 1, 2023 to December 4, 2023 is approximately $60,000 for 110 employees.

46. Excluding PTO, no individual is owed more than $15,150 for prepetition wages, salaries, commissions, or other compensation, including benefits, and Debtor will not pay, and does not request authority to pay, any person more than the $15,150 amount of their priority claim as provided by 11 U.S.C. §§ 507(a)(4) and (a)(5) other than PTO taken in the ordinary course of business.

47. To protect the value of Debtor's business as a going concern and to prevent immediate and irreparable damage to Debtor's business operations and its ability to operate in the ordinary course, Debtor must honor its prepetition wage obligations. A failure to pay accrued

Page 13 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

wages, salaries, commissions, expenses, benefits, and other related obligations, or even a delay in such payment, would have a significant negative impact on worker morale and some employees may not report to work, thereby impairing Debtor's ability to continue operations. Debtor believes the requested relief will enable it to maintain its current operations without interruption and, at the same time, maintain worker morale. Debtor's employees are vital to its efforts to reorganize and provide essential services, without which Debtor would be unable to function. Without the relief requested, Debtor's ability to preserve its assets for the benefit of all creditors and equity security holders, and Debtor's ability to successfully reorganize, will be severely impaired.

## **UTILITIES**

48. In connection with the operation of its business, Debtor obtains telephone, internet, electric, gas, water, waste removal, and other utility services (collectively, "Utility Services") from numerous utility companies ("Utility Companies").

49. If Utility Companies are permitted to refuse or discontinue service for even a brief period, the impact on Debtor's operations could be devastating. Such an interruption would damage customer relationships, revenue, and profits, and would ultimately adversely affect Debtor's efforts to reorganize. Moreover, such an interruption would result in a diminution in value of Debtor's assets and cause irreparable harm to Debtor's estate. Accordingly, maintaining uninterrupted Utility Services is essential to Debtor's ability to maintain its business operations and to preserve the value of its assets.

## **SUPPLEMENTAL NOTICE OF CLAIM BAR DATE**

50. Debtor's aircraft kits are the most numerous of all homebuilt aircraft. Many of these completed aircraft may no longer be owned by the original builder, and may have changed ownership many times. Additionally, many aircraft kits are built by customers for the express purpose of immediate sale of the completed aircraft. Debtor believes that a substantial number of owners of completed aircraft kits may not be aware of potential issues related to their aircraft

Page 14 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204

Case 23-62260-dwh11 Doc 15 Filed 12/04/23

by virtue of their degree of separation from the purchase and assembly process of the original aircraft kit.

51. Therefore, Debtor desires to issue a supplemental notice of claims bar date to each and every known current and former customer who has purchased a kit from Debtor, and to each and every current known owner of a Van's RV aircraft (the "Notice Parties"). Debtor will also post the supplemental notice on its website. This supplemental notice will notify the Notice Parties that they must file a claim by the claims bar date, asserting any actual, contingent, or unliquidated claim they may have, including claims due to potential issues including, but not limited to, corrosion, coverage of primer, cracks in structural components and laser cut parts, leaking radiators and fuel tanks, flutter related events, fire and carbon monoxide protection, landing gear failures, pitot static systems, fatigue cracking in various components, canopy or door latch systems, rollover protection, brake pedal design or any other concerns or issues they may have that would result in a claim. In addition, there have been statements made on *vansairforce.net* and other sites about concerns related to design or defect in Debtor's parts and components related to these issues and many others.

**RETENTION OF BMC GROUP AS CLAIMS AND NOTICING AGENT**

52. Debtor seeks authority to retain BMC Group ("BMC") as a claims and noticing agent and pay BMC in the ordinary course without further court order. Given the size of the matrix and number of potential claims in this case, Debtor intends to have BMC handle full-matrix mailings and claims administration. It would be burdensome and inefficient for Debtor or its counsel to do so.

/ / /

/ / /

/ / /

/ / /

/ / /

Page 15 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC
IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 15    Filed 12/04/23

53. BMC is a leading global provider of legal management solutions and is well suited to act as a claims and noticing agent in this case.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED: December 4, 2023.

                                        /s/ Clyde A. Hamstreet
                                        Clyde A. Hamstreet

043989\00001\16644549v8

Page 16 of 16 – DECLARATION OF CLYDE A. HAMSTREET OF HAMSTREET & ASSOCIATES, LLC IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11 Doc 15 Filed 12/04/23