In re

**Van's Aircraft, Inc.**

Case No. **23-62260-dwh11**

☐ Amended

Debtor

**Notice of Final Hearing on Motion [*Check One*]**

☐ **For Use of Cash Collateral**

☒ **To Obtain Credit**

YOU ARE NOTIFIED THAT:

1. The undersigned moving party, **Debtor Van's Aircraft, Inc.** ,
filed a Motion ☐ For Use of Cash Collateral ☒ To Obtain Credit (check one). The
motion is attached and includes the statement required by Local Bankruptcy Form
(LBF) 541.5, Procedures re: Motions for Use of Cash Collateral or to Obtain Credit.

2. The name and service address of the moving party's attorney (or moving party, if no
attorney) are: **Timothy J. Conway, Tonkon Torp LLP, 888 SW Fifth Ave., Ste. 1600,**
**Portland, OR 97204**

3. An evidentiary hearing on the motion, at which witnesses may testify, will be held as
follows:

   **Date:** **12/19/2023**        **Time:** **9:30 am**

   **Location**:

   ☐ Courtroom #_____, _____

   ☐ Telephone Hearing [*See LBF 888, Telephone Hearing Requirements.*]

   **Call In Number:** (888) 684-8852

   **Access Code:** ☐ 5870400 for Judge David W. Hercher (dwh)

   ☐ 1238244 for Judge Peter C. McKittrick (pcm)

   ☐ 4950985 for Judge Teresa H. Pearson (thp)

   ☐ 3388495 for Judge Thomas M. Renn (tmr)

   ☒ Video Hearing. To connect, see www.orb.uscourts.gov/video-hearings.

**541 (12/1/2022)**                    Page 1 of 2

4. If you wish to object to the motion, you must, within 14 days of the date of the filing of the motion, or December 18, 2023, file with the clerk at 1050 SW 6th Ave. #700, Portland OR 97204 or 405 E 8th Ave. #2600, Eugene OR 97401: (1) a written response which states the facts upon which you will rely, and (2) a certificate showing the response has been served on the U.S. trustee and the attorney or party named in paragraph 2 above.

5. I certify that on ____12/08/2023____ this notice and the motion were served pursuant to Federal Rule of Bankruptcy Procedure (FRBP) 7004 on the debtor(s), any debtor's attorney, any trustee, any trustee's attorney, members of any committee appointed under 11 U.S.C. § 1102 or elected pursuant to 11 U.S.C. § 705 or its authorized agent (or, if no committee in a chapter 11 case, on all creditors listed on the list filed pursuant to FRBP 1007(d)), any creditors' committee attorney, the U.S. trustee, and all entities with any interest in the cash collateral subject to this motion, whose names and addresses used for service are as follows:

**The Richard E. Van Grunsven
and Diane E. Van Grunsven Trust
c/o Garrett Ledgerwood
c/o Gib Masters
Miller Nash LLP
111 SW Fifth Ave, Ste 3400
Portland, OR 97204**

| | |
|---|---|
| */s/ Timothy J. Conway* | **851752** |
| Signature of Moving Party or Attorney | OSB# |

| | |
|---|---|
| **14401 Keil Road NE, Aurora, OR 97002** | **(-7693)** |
| (If debtor is movant) Debtor's Address & Last 4 Digits of Taxpayer ID# | |

**541 (12/1/2022)**                         Page 2 of 2

1   Timothy J. Conway, OSB No. 851752
        Direct Dial: (503) 802-2027
2       Email: tim.conway@tonkon.com
3   Michael W. Fletcher, OSB No. 010448
        Direct Dial:  (503) 802-2169
4       E-Mail: michael.fletcher@tonkon.com
    Ava L. Schoen, OSB No. 044072
5       Direct Dial:  (503) 802-2143
        Email: ava.schoen@tonkon.com
6   Tonkon Torp LLP
    888 SW Fifth Ave., Suite 1600
7   Portland, OR 97204
    Main:  503.221.1440
8   Facsimile:  503.274.8779

9       Attorneys for Debtor

10

11              UNITED STATES BANKRUPTCY COURT

12                   DISTRICT OF OREGON

13  In re                               Case No. 23-62260-dwh11

14  Van's Aircraft, Inc.,               **DEBTOR'S MOTION FOR ORDER**
                                        **AUTHORIZING DEBTOR TO**
15                  Debtor.             **OBTAIN SECURED CREDIT**

16                                      *EXPEDITED HEARING REQUESTED*

17  _____

18          Pursuant to 11 U.S.C. §§ 364(c)(1), (c)(2), (d) and Bankruptcy Rule 4001(c), Debtor and

19  Debtor-in-Possession Van's Aircraft, Inc. ("Debtor" or "Borrower") hereby moves (the

20  "Motion") this Court for an interim order substantially in the form attached hereto as **Exhibit 1**

21  (the "Interim Order") and a final order[1] authorizing Debtor to obtain secured and super-priority

22  administrative expense post-petition financing pursuant to Sections 364(c)(1), (c)(2), and (d) of

23  the Bankruptcy Code.  In support of the Motion, Debtor incorporates the statements contained in

24

25  _____

26  [1]     The Debtor will file the final order in advance of the final hearing on this Motion.

**Page 1 of** 5 – DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED
                CREDIT

1    the Declaration of Clyde A. Hamstreet in Support of Debtor's First Day Pleadings filed

2    contemporaneously herewith and respectfully represents as follows:

3         1.      On December 4, 2023 (the "Petition Date"), Debtor filed its voluntary petition for

4    relief under Chapter 11 of Title 11 of the United States Code.

5         2.      Debtor has continued in possession of its property and is continuing to operate

6    and manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of

7    Title 11 of the United States Code.

8         3.      No request has been made for the appointment of a trustee or examiner, and no

9    official committee of unsecured creditors has been appointed in Debtor's case.

10        4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

11    1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

12    proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the

13    relief sought by this motion are Sections 364(c)(1), (c)(2), and (d) of Chapter 11 of Title 11 of

14    the United States Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

15        5.      Debtor is a kit aircraft manufacturer, founded in 1972. The Van's RV series of

16    aircraft are all-aluminum, low-wing monoplanes of monocoque construction. As of October,

17    2023, over 11,000 Van's RV kits have been reported as completed and flown by customers, with

18    thousands more under construction, making them the most numerous of all homebuilt aircraft.

19    The Van's Aircraft factory is currently located at a 60,000 square foot facility in Aurora, Oregon,

20    and has approximately 110 employees.

21        6.      By this Motion, Debtor requests entry of an order authorizing Debtor to (a) obtain

22    postpetition financing consisting of loans and advances from the Richard E. and Diane E. Van

23    Grunsven Trust (the "Trust") on a secured basis (the "DIP Loans") allowable under 11 U.S.C.

24    §§ 364(c)(1), (c)(2), and (d), which DIP Loans are secured by senior liens on all property of the

25    estate, including estate property that is subject to prepetition liens, and with priority over any and

26    all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy

Code, except for a carveout for professional fees and expenses pursuant to Sections 330 and 331 of the Bankruptcy Code and unpaid fees of US Trustee fees pursuant to 28 U.S.C. § 1930(a); and (b) enter into the Loan Agreement ("Loan Agreement") evidencing the DIP Loans substantially in the form attached to the Interim Order as **Exhibit A.**

7.    Debtor needs to obtain additional working capital in order to meet its obligations and operate its business.  Debtor's known needs are set forth in the budget attached to Debtor's Motion for Temporary and Final Authority to Use Cash Collateral.  Debtor also needs to be ready to provide cash advances and meet other terms that may be necessary for Debtor to continue to acquire necessary materials in the course of its business operations and meet additional unexpected needs and business requirements as they may arise.  In addition, funds may be needed to pay the administrative expenses associated with the Chapter 11 case.

8.    The Trust is committed to supporting the recapitalization of Borrower and the development and confirmation of a plan of reorganization.  Mr. Van Grunsven and his wife are and have been in the process of liquidating a substantial portion of their assets in order to lend and invest the proceeds thereof in Borrower on both a pre and post-petition basis as necessary to keep the Borrower viable.  The Trust wishes to make the DIP Loans to Borrower and to otherwise invest in the reorganization of Borrower.

9.    Pursuant to the Loan Agreement, the Trust has agreed to make optional advances in amounts totaling up to $6 million.  Debtor anticipates it may need to borrow up to $2 million on an interim basis pending a final hearing.

10.    All loans made by the Trust shall be treated as DIP Loans under the Loan Agreement and will accrue interest at 9.75% per annum.  The Debtor may elect to pay interest monthly or add accrued interest to the loan balance.  The DIP Loans will be payable on the earlier of the (a) Effective Date of any plan of reorganization confirmed in the Bankruptcy Cases, (b) date of the entry of an order converting this Bankruptcy Case to a case under Chapter 7, (c) date of the entry of an order appointing a trustee under Chapter 11, (d) upon the Trust's

Page 3 of  5 –   DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED
                  CREDIT

1  election upon the occurrence of an event of default under the Loan Agreement, and (e) June 30,

2  2024.  Alternatively, the Trust may elect to convert the DIP Loan balance to equity upon

3  confirmation of Debtor's plan of reorganization.

4         11.    The Trust's administrative claim for the DIP Loans under Sections 364(c)(1) and

5  (c)(2) of the Bankruptcy Code shall be subject and subordinate only to (a) unpaid fees of the

6  U.S. Trustee pursuant to 28 U.S.C. § 1930(a) and (b) certain unpaid administrative expense

7  claims for professional fees and expenses allowed pursuant to 11 U.S.C. § 330 or § 331 as set

8  forth in the Loan Agreement.  Pursuant to Sections 364(d)(1), the Trust's secured claim shall be

9  senior to the Trust's pre-petition liens on property of Debtor's estate.

10        12.    It is in the best interests of Debtor and its estate to be authorized to obtain credit

11  from the Trust on a secured, priming, and superpriority basis pursuant to the terms set forth in

12  the Loan Agreement as it is necessary to assist Debtor in continuing the operation of its business

13  in the ordinary course and preserving the going concern value of Debtor for the benefit of its

14  creditors.

15        13.    Without approval of Debtor's Motion, Debtor will be unable to maintain and

16  preserve its business operations and provide necessary and appropriate assurances to all vendors,

17  suppliers, customers, and creditors that it will be able to maintain and preserve its assets and

18  effectuate an orderly and efficient reorganization.  If Debtor is unable to have sufficient funds

19  available to provide such assurances, Debtor's ability to reorganize will be seriously jeopardized,

20  to the substantial detriment of creditors, employees, and other parties-in-interest.  Debtor is

21  unable to obtain adequate financing on equal or more favorable terms than those offered by the

22  Trust.  Moreover, the Trust has consented to have its prepetition liens on property of the estate

23  primed by the senior lien proposed herein to be granted to the Trust as security for the DIP Loan.

24        14.    Debtor believes the proposed terms and conditions in the Loan Agreement are fair

25  and equitable and in the best interest of Debtor's estate.

26

Page 4 of  5 –   DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED
                 CREDIT

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11   Doc 12    Filed 12/04/23

Case 23-62260-dwh11    Doc 29    Filed 12/08/23

1        15.     The Motion does not contain any of the provisions set forth in paragraph 5 of

2 Local Bankruptcy Form 541.5 except for 541.5(5)(a)(3). The Motion includes a provision

3 regarding the relative priority of the Trust's loan. As set forth above, the Trust has agreed that

4 the DIP Loan will: (1) be subordinate to (a) unpaid fees of the U.S. Trustee and (b) unpaid

5 administrative expense claims for professional fees and expenses; Debtor's professionals require

6 such subordination as a term of their engagement; and (2) prime the Trust's pre-petition liens on

7 property of the estate; the Trust requires this in order to make the loans. The Trust has consented

8 to have its prepetition liens primed, and Debtor is unable to otherwise obtain credit on the same

9 or better terms.

10        WHEREFORE, Debtor requests the entry of an order granting the relief requested

11 herein, and such other and further relief as the Court may deem proper.

12        DATED: December 4, 2023.

13                                TONKON TORP LLP

14

15                          By */s/ Timothy J. Conway*

16                            Timothy J. Conway, OSB No. 851752
                           Michael W. Fletcher, OSB No. 010448

17                            Ava L. Schoen, OSB No. 044072
                           Attorneys for Debtor

18

19

20

21

22

23

24

25

26

**Page 5 of** 5 – DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED
      CREDIT

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11 Doc 12 Filed 12/04/23

Case 23-62260-dwh11 Doc 29 Filed 12/08/23

# EXHIBIT 1

## Proposed Form of Order

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| In re | Case No. 23-62260-dwh11 |
|---|---|
| Van's Aircraft, Inc., | **INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED CREDIT** |
| Debtor. | |

THIS MATTER having come before the Court upon Debtor' Motion for Order Authorizing Debtor to Obtain Secured Credit (the "Motion"), notice of the Motion having been given pursuant to Bankruptcy Rule 4001(c) and LBR 4001-1.D, the Court having heard and considered the arguments of counsel and all relevant pleadings, exhibits, and documents of record in this case, and the representation of counsel at the time of hearing; now, therefore, the Court hereby finds and concludes:

A.      On December 4, 2023 (the "Petition Date"), Debtor filed its Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code.

B.      Debtor continues in possession of its property and is continuing to operate and manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**Page 1 of 6 -**    ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED CREDIT

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 23-62260-dwh11    Doc 12    Filed 12/04/23

Case 23-62260-dwh11    Doc 29    Filed 12/08/23

C.     The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(b) and 1334, and these are core proceedings pursuant to 28 U.S.C. § 157(b).

D.     The Richard E. and Diane E. Van Grunsven Trust (the "Trust") has agreed to extend postpetition loans to Debtor (the "DIP Loans") on a secured priming, super-priority basis pursuant to 11 U.S.C. §§ 364(c)(1), (c)(2), and (d) on the terms set forth in the Loan Agreement attached hereto as **Exhibit A** (the "Loan Agreement") and that the DIP Loans will be subordinate to the following (the "Carve Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000; (c) to the extent allowed by the Bankruptcy Court at any time and not exceeding the Budget (as defined in the Loan Agreement), all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by Debtor and any official committee of creditors at any time before or on the first business day following delivery by the Trust of a Carve-Out Trigger Notice (as defined in the Loan Agreement), but not to exceed $750,000; and (d) to the extent allowed by the Bankruptcy Code at any time, all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by Debtor and any official committee of creditors at any time after the first business day following delivery by the Trust of the Carve-Out Trigger Notice (as defined in the Loan Agreement), in an aggregate amount not to exceed $10,000.

E.     Debtor requires financing to enable Debtor to maintain business operations and otherwise meet its financial demands.  Without such financing, the enterprise value of Debtor's business will be diminished and Debtor's ability to maintain and preserve its assets and effect an orderly and efficient reorganization will be seriously jeopardized, to the substantial detriment of creditors, employees, and other parties-in-interest.

F.     Debtor is unable to obtain adequate financing on equal or more favorable terms than those offered by the Trust.

**Page 2 of 6 -**     ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED CREDIT

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

G.     The Trust has consented to have its prepetition liens on property of the estate primed by the DIP Loan.

H.     Under the circumstances, the notice given by the Debtor of the Motion and the interim and final hearing on the Motion constitutes due and sufficient notice thereof and complies with Section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c).

I.     Debtor believes the proposed terms and conditions of the financial accommodations provided in the Loan Agreement are fair and equitable, and in the best interest of Debtor's estates.

Based on the foregoing, good causes exists to grant the Motion and to enter this Interim Order.  Now, therefore,

IT IS HEREBY ORDERED as follows:

1.     The Motion is GRANTED in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights therein, are hereby denied and overruled on the merits.

2.     The Loan Agreement is approved in its entirety.

3.     Debtor is authorized to execute and deliver to the Trust the Loan Agreement. The Loan Agreement shall constitute and evidence the valid and binding obligations of the Debtor thereunder, which obligations shall be enforceable against the Debtor and its estate, and any successors thereto (including, without limitation, any trustee or other estate representative in any succeeding case), and their creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the Loan Agreement or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or based on any Avoidance Actions), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable,

**Page 3 of 6 -**     ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED CREDIT

contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      Debtor is authorized, on an interim basis, to incur indebtedness under the terms of the Loan Agreement in an aggregate amount not to exceed $2,000,000 through the date that is the earlier of (a) December 31, 2023 and (b) entry of a subsequent order terminating the Debtor's authorization hereunder (the "Interim Period").

5.      During the Interim Period, the Debtor is authorized and directed to make such payments and perform such obligations as required or permitted under the terms of the Loan Agreement.

6.      With respect to all loans and advances made pursuant to the Loan Agreement, the Trust is granted, pursuant to Sections 364(d)(1), 364(c)(1) and (c)(2) of the Bankruptcy Code, a first priority secured lien (the "DIP Lien") on all Debtor's assets (the "DIP Collateral") with priority over all other liens and encumbrances, and an administrative expense claim with priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code (the "Superpriority Claim"), both subject and subordinate only to the Carve-Out.  Pursuant to Sections 364(d)(1), the DIP Lien shall be senior to the Trust's pre-petition liens on property of Debtor's estate.

7.      The DIP Lien and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, (subject to entry of the final order on the Motion) the "equities of the case" exception of section 552 of the Bankruptcy Code, or (subject to entry of the final order on the Motion) section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to any lien that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise and, and, (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in this proceeding, whether upon the conversion to a case under chapter 7 of the Bankruptcy

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Code or appointed in this proceeding prior to conversion, or in any other proceedings related to any of the foregoing.

8.       This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Lien, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "Perfection Act"). Notwithstanding the foregoing, if the Trust shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the Trust is authorized to perform such act, and the Debtor is authorized and directed to perform such act to the extent necessary or reasonably required by the Trust, which act or acts shall be deemed to have been accomplished as of the Petition Date, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The Trust may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Interim Order in accordance with applicable law. Should the Trust so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

9.       The terms of this Interim Order were negotiated in good faith and at arm's length by and between the Debtor and the Trust. The Trust shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.

10.      If any or all provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by any subsequent order of this Court, such reversal, modification, vacation,

**Page 5 of 6 -**    ORDER AUTHORIZING DEBTOR TO OBTAIN SECURED CREDIT

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

or stay shall not affect the validity of any obligation to the Trust that is or was incurred by Debtor pursuant to this Interim Order, and that is or was incurred prior to the Effective Date of such reversal, modification, vacation, or stay. Such reversal, modification, vacation, or stay shall not affect the validity and enforceability of any priority authorized or granted by this Interim Order.

11.     IT IS FURTHER ORDERED that a continued and proposed hearing on the Motion shall be held by the Court in Courtroom _____ of the United States Bankruptcy Court for the District of Oregon, 1050 SW Sixth Ave., ctrm. ___, Portland, Oregon 97204 on _____, 2023, at _____.m. before the Honorable ____. Within three business days after the entry hereof, Debtor shall mail or otherwise serve a copy of this Interim Order, together with a notice of the further hearing.

# # #

I certify that I have complied with the requirements of LBR 9021-1(a).

Presented by:

TONKON TORP LLP

By /s/ _____
        Timothy J. Conway, OSB No. 851752
        Michael W. Fletcher, OSB No. 010448
        Ava L. Schoen, OSB No. 044072
        888 SW Fifth Avenue, Suite 1600
        Portland, OR 97204-2099
        Telephone:    (503) 221-1440
        Facsimile:    (503) 274-8779
        Email:    tim.conway@tonkon.com
                  michael.fletcher@tonkon.com
                  ava.schoen@tonkon.com
        Attorneys for Debtor

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

# EXHIBIT A

## LOAN AGREEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**TONKON TORP LLP**
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

**Loan Agreement**

between

**RICHARD E. VAN GRUNSVEN, AND DIANE E. VAN GRUNSVEN,**
**as Trustees of the RICHARD E. VAN GRUNSVEN AND**
**DIANE E. VAN GRUNSVEN TRUST**

and

**VAN'S AIRCRAFT, INC.**

dated as of

December 4, 2023

4856-5817-0248.6

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS AND INTERPRETATION ........................................................................ 4

    Section 1.01 Definitions.................................................................................................. 4
    Section 1.02 Interpretation. .......................................................................................... 12
ARTICLE II THE COMMITMENT AND LOANS .......................................................................... 13

    Section 2.01 Revolving Credit. ....................................................................................... 13
    Section 2.02 Procedures for Revolving Credit Borrowing. ............................................. 13
    Section 2.03 Mandatory Prepayments............................................................................ 13
    Section 2.04 Interest...................................................................................................... 13
    Section 2.05 Computation of Interest and Fees. ........................................................... 14
ARTICLE III CONDITIONS PRECEDENT ................................................................................... 14

    Section 3.01 Conditions Precedent to Effectiveness of Agreement and Each Loan......... 14
ARTICLE IV PRIORITY AND LIENS............................................................................................ 16

    Section 4.01 Status of Obligations; Perfecting and Priority of Security Interests............ 16
    Section 4.02 Carve-Out.................................................................................................. 17
ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................................ 17

    Section 5.01 Existence; Compliance With Laws. ............................................................. 17
    Section 5.01 Power; Authorization; Enforceability. ........................................................ 17
    Section 5.02 No Contravention...................................................................................... 17
    5.03 Perfected Security Interest. .................................................................................... 17
ARTICLE VI AFFIRMATIVE COVENANTS ................................................................................. 18

    Section 6.01 Financial Statements. ................................................................................ 18
    Section 6.02 Conference Call. ........................................................................................ 18
    Section 6.02 Other Information. .................................................................................... 18
    Section 6.04 Chapter 11 Plan Milestones....................................................................... 19
    Section 6.05 Maintenance of Insurance.......................................................................... 19
    Section 6.06 Inspection of Property; Books and Records; Discussions............................. 19
    Section 6.07 Use of Proceeds. ....................................................................................... 19
    Section 6.108 Further Assurances. ................................................................................. 19
ARTICLE VII NEGATIVE COVENANTS ...................................................................................... 20

    Section 7.01 Limitation on Debt..................................................................................... 20
    Section 7.02 Limitation on Liens. ................................................................................... 20
    Section 7.03 Mergers; Nature of Business. .................................................................... 21
    Section 7.04 Limitation on Investments.......................................................................... 21
    Section 7.05 Limitation on Dispositions.......................................................................... 22
    Section 7.06 Additional Bankruptcy Matters. ................................................................ 22
ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ............................................................... 23

    Section 8.01 Events of Default........................................................................................ 23
    Section 8.02 Remedies Upon Event of Default................................................................ 25
    Section 8.03 Affidavit Following Event of Default........................................................... 26
ARTICLE IX MISCELLANEOUS ................................................................................................ 26

    Section 9.01 Notices. ..................................................................................................... 26
    Section 9.02 Amendments and Waivers. ....................................................................... 27

4856-5817-0248.6

**Exhibit A - Page 2 of 33**

Case 23-62260-dwh11    Doc 12    Filed 12/04/23

Case 23-62260-dwh11    Doc 29    Filed 12/08/23

**Section 9.03 Expenses; Indemnity; Damage Waiver.** ...................................................... 28
**Section 9.04 Successors and Assigns.** ............................................................................ 28
**Section 9.05 Survival.** .................................................................................................... 29
**Section 9.06 Counterparts; Integration; Effectiveness.** ................................................ 29
**Section 9.07 Severability.** .............................................................................................. 30
**Section 9.08 Right of Setoff.** ......................................................................................... 30
**Section 9.09 Governing Law; Jurisdiction; Consent to Service of Process.** .................... 30
**Section 9.10 New Value.** ............................................................................................... 31
**Section 9.11 Waiver of Jury Trial.** ................................................................................. 31
**Section 9.12 No Fiduciary Duties.** ................................................................................. 31
**Section 9.13 Headings.** ................................................................................................. 32

SCHEDULES ...................................................................................................................... 34

EXHIBITS ........................................................................................................................... 34

**EXHIBIT A Budget.** ........................................................................................................ 34
**EXHIBIT A Form of Interim DIP Order.** .......................................................................... 35

4856-5817-0248.6

Exhibit A - Page 3 of 33

Case 23-62260-dwh11    Doc 12    Filed 12/04/23

Case 23-62260-dwh11    Doc 29    Filed 12/08/23

# Loan Agreement

This Loan Agreement (this "**Agreement**"), dated as of December 4, 2023 is entered into between VAN'S AIRCRAFT, INC., an Oregon corporation ("**Debtor**"), and RICHARD E. VAN GRUNSVEN AND DIANE E. VAN GRUNSVEN, as Trustees of the RICHARD E. VAN GRUNSVEN AND DIANE E. VAN GRUNSVEN TRUST ("**Lender**").

## RECITALS

A.       On December 4, 2023, Debtor commenced Chapter 11 Case No. _____ (the "**Case**") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Oregon.

B.       Debtor has requested that Lender provide a revolving credit facility that is senior secured, super-priority as to Debtor in the maximum amount of $6,000,000, to fund the working capital requirements of Debtor, including certain costs associated with the Case, and Lender is willing to provide such credit facility on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.01    Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"**Acceptable Plan of Reorganization**" means a Plan of Reorganization that is reasonably acceptable to Lender, or that provides for, at Lender's option, (a) the payment in full in cash of the Obligations under the Loan Documents upon the effective date of such Acceptable Plan of Reorganization, or (b) the conversion of the Loans into 100% of stock of Debtor, and such Plan of Reorganization is otherwise reasonably acceptable to the Lender.

"**Administrative Expenses**" means (i) the allowed fees and expenses of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b), and (ii) the allowed fees and expenses payable under Sections 330 and 331 of the Bankruptcy Code to professional persons retained by the Debtor pursuant to an order of the Bankruptcy Court or by any statutory committee appointed in the Case; except that, "Administrative Expenses" shall not include any fees or expenses incurred, directly or indirectly, in respect of, arising from or relating to (a) the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against Lender or with respect to this Agreement or any of the other Loan Documents, the Obligations, or the Prepetition Obligations, (b) hindering, delaying or otherwise attempting to prevent the enforcement by Lender of its Liens or realization upon any Collateral, or (c) arising after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

4

4856-5817-0248.6

"**Agreement**" has the meaning given to such term in the recitals hereto.

"**Affiliate**" as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Available Revolving Credit**" means, at any time, an amount equal to the difference between $6,000,000 and the aggregate principal amount of the Loans outstanding at such time.

"**Bankruptcy Code**" has the meaning given to such term in the Recitals.

"**Bankruptcy Court**" means the United States Bankruptcy Court for Oregon or any other court having jurisdiction over the Case from time to time, including any judge presiding over the Bankruptcy Case.

"**Borrowing Date**" means any Business Day specified by Debtor in a Borrowing Notice as a date on which Debtor requests Lender to make a Loan hereunder.

"**Borrowing Notice**" with respect to any request for a borrowing of Loans hereunder, means a notice from Debtor requesting a Loan.

"**Budget**" means (a) a 13-week cash flow forecast of receipts and disbursements for the period from the Effective Date setting forth projected cash flows and disbursements attached hereto as **Exhibit A** (the "**Initial Budget**") and (b) updated 13-week cash flow forecasts, in form substantially similar to the Initial Budget (the "**Updated Budget**"), in all cases setting forth in reasonable detail the receipts and disbursements of Debtor on a weekly basis from the Petition Date, as such budget may be amended or modified from time to time by Debtor, subject to consent of Lender.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in Portland, Oregon are authorized or required by law to close.

"**Carve-Out**" means a carveout from Lender's pre-petition and post-petition claims (whether secured or unsecured), including the Lender Superpriority Claim, for unpaid Administrative Expenses (i) that are provided for in the Budget and incurred prior to an Event of Default but not yet paid; and (ii) an aggregate amount not to exceed the Carve-Out Amount for reasonable fees and expenses incurred following an Event of Default; but specifically excluding any success, completion, or similar fees.

"**Carve-Out Amount**" means, at any time, the aggregate amount of the following expenses incurred in accordance with the Budget and unpaid at such time: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy

5

4856-5817-0248.6

Code in an amount not to exceed $10,000; (c) to the extent allowed by the Bankruptcy Court at any time and not exceeding the Budget, all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by Debtor and any official committee of creditors at any time before or on the first business day following delivery by Lender of a Carve-Out Trigger Notice, but not to exceed $750,000; and (d) to the extent allowed by the Bankruptcy Code at any time, all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by Debtor and any official committee of creditors at any time after the first business day following delivery by Lender of the Carve-Out Trigger Notice, in an aggregate amount not to exceed $10,000 (the "**Carve-Out Trigger Notice Cap**").

"**Carve-Out Reserve Account**" means a deposit account of Debtor to be established prior to the Effective Date, which shall be used solely to escrow funds for the payment of the Carve-Out Amount.

"**Carve-Out Trigger Notice**" means a written notice delivered by Lender to Debtor, its counsel, the US Trustee, and lead counsel to any official committee of creditors, which notice may be delivered following the occurrence and during the continuance of an Event of Default, and stating that the Carve-Out Trigger Notice Cap has been invoked.

"**Case**" has the meaning given to such term in the Recitals.

"**Cash Collateral**" means shall mean all cash and Cash Equivalents of the Debtor, whenever or wherever acquired and the proceeds of all Collateral.

"**Cash Equivalents**" as to any Person, means (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any State thereof or, the District of Columbia, having capital, surplus, and undivided profits aggregating in excess of $500,000,000, having maturities of not more than one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, (d) commercial paper issued by any issuer rated at least A-1 by S&P or at least P-1 by Moody's (or carrying an equivalent rating by a nationally recognized rating agency if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally), and in each case maturing not more than one year after the date of acquisition by such Person, or (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Cash Management Order**" means the Bankruptcy Court order, in form and substance reasonably satisfactory to Lender, relating to Debtor's cash management system and bank accounts.

4856-5817-0248.6

"**Change of Control**" means (a) any Person or group of persons within the meaning of § 13(d)(3) of the Securities Exchange Act of 1934 becomes the beneficial owner, directly or indirectly, of 35% or more of the outstanding Equity Interests of Debtor, or (b) individuals who constitute the directors on the Effective Date cease for any reason to constitute at least a majority of the board of directors of Debtor.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, all real, personal, and mixed property (including equity interests) of Debtor's estate in the Case, including, without limitation, all inventory, accounts, investment property, general intangibles, contracts, documents, letter-of-credit rights, commercial tort claims, chattel paper, owned real estate, real property leaseholds, licenses and permits, fixtures, equipment, deposit accounts, money, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, including, without limitation, the products and proceeds thereof.

"**Collateral Documents**" means this Agreement, the Security Agreement, and the Mortgage.

"**Contractual Obligation**" of any Person, means any provision of any security issued by such Person or of any agreement, instrument, or other undertaking to which such Person is a party or by which it or any of its property is bound, other than the Obligations.

"**Credit Facility**" means the revolving credit facility provided for in Section 2.01.

"**CRO**" means Clyde Hamstreet.

"**Debt**" of any Person at any date, without duplication, means (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of business), (c) all obligations of such Person evidenced by notes, bonds, debentures, or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights, or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, or similar facilities in respect of obligations of the kind referred to in subsections (a) through (e) of this definition, (g) any guaranty by such Person in respect of obligations of the kind referred to in subsections (a) through (f) above, and (h) all obligations of the kind referred to in subsections (a) through (g) above secured by (or which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

4856-5817-0248.6

"**Debtor**" has the meaning given to such term in the recitals hereto.

"**Default**" means any of the events specified in Section 8.01 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Section 8.01 would, unless cured or waived, become an Event of Default.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease, or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer, or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollars**" means the lawful currency of the United States.

"**Effective Date**" means the date on which each of the conditions precedent set forth in Section 3.01 are satisfied.

"**Equity Interests**" means with respect to any Person any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership (or profit) interests in a Person (other than a corporation), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights, or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights, or other interests are authorized or otherwise existing on any date of determination.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Final DIP Order**" means an order entered or approved by the Bankruptcy Court authorizing the Credit Facility in substantially the form of the Interim DIP Order, with only such modifications in form and substance that are satisfactory to Lender (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of Lender, in Lender's sole discretion).

"**Final Order**" means  shall mean an order or judgment of the Bankruptcy Court as entered on its docket that has not, in whole or in part, been reversed, vacated, modified, amended or stayed pursuant to any applicable bankruptcy law or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari or motion for reargument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired.

4856-5817-0248.6

"**First Day Orders**" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within 14 days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to Lender.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Initial Budget**" has the meaning given to such term in the definition of Budget.

"**Interest Payment Date**" means the first day of each month.

"**Interim Availability Amount**" means, as of any date of determination, the lesser of (a) $2,000,000, and (b) such lower amount as the Bankruptcy Court may order.

"**Interim DIP Order**" means an interim order entered or approved by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Lender in its sole discretion) in the form set forth as **Exhibit B**, with changes to such form as are satisfactory to Lender, in its sole discretion, approving the Loan Documents, which Interim DIP Order shall, among other things (a) have been entered on such prior notice to such parties as may be satisfactory to Lender in its sole discretion, (b) authorize the extensions of credit in respect of the Credit Facility in the amounts and on the terms set forth herein, (c) grant the Lender Superpriority Claim status and other collateral and liens referred to herein and in the other Loan Documents, and (d) approve the payment by Debtor of the fees provided for herein.

"**Lender**" is defined in the preamble hereof.

"**Lender Superpriority Claim**" has the meaning given to such term in Section 4.01(a).

"**Lien**" means any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest, or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"**Loan**" means any Loan made by Lender under Section 2.01.

4856-5817-0248.6

"**Loan Documents**" means this Agreement, the Collateral Documents, and the Orders.

"**Margin Stock**" has the meaning specified in Regulation U of the Board of Governors of the Federal Reserve System of the United States as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) of Debtor, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any material Lien purported to be created by any Loan Document, (d) the priority of the Lender Superiority Claim, (e) the rights or remedies of Lender under any Loan Document, or (f) the ability of Debtor to perform any of its material obligations under any Loan Document.

"**Material Contracts**" with respect to any Person, means each contract to which such Person is a party involving aggregate consideration payable by or to such Person equal to at least $100,000 or otherwise material to the business, condition (financial or otherwise), operations, performance, properties, or prospects of such Person.

"**Maturity Date**" means the earlier of (a) May 31, 2024, (b) the date of acceleration or termination of the Credit Facility in accordance with Section 8.02 with this Agreement; and (c) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code) of any Chapter 11 Plan confirmed in the Case.

"**Moody's**" means Moody's Investors Service, Inc., and any successor thereto.

"**Mortgage**" means the Trust Deed made by Debtor in favor of Lender dated October 30, 2023, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time to the extent permitted under the Loan Documents.

"**Obligations**" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, covenants, and indemnities of, Debtor arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect, absolute, or contingent, due or to become due, now existing or hereafter arising.

"**Orders**" means, collectively, the Interim DIP Order, the Final DIP Order, and the Cash Management Order.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Petition Date**" means December 4, 2023 the date on which Debtor became a debtor in the Case.

"**Plan Effective Date**" means the date of the effectiveness of an Acceptable Plan of Reorganization that has been confirmed pursuant to a final order of the Bankruptcy Court.

4856-5817-0248.6

"**Plan of Reorganization**" means a plan of reorganization or plan of liquidation in the Case.

"**Prepetition Notes**" means (a) the Promissory Note, dated as of September 18, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date), payable by Debtor to Lender in the principal amount of $1,000,000.00, and (b) the Promissory Note, dated as of October 30, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date), payable by Debtor to Lender in the principal amount of $2,000,000.00.

"**Prepetition Obligations**" means the indebtedness owed by Debtor to Lender under the Prepetition Notes.

"**Prepetition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any trade payables or other prepetition claims against Debtor.

"**Primed Liens**" has the meaning given to such term in Section 4.01(c).

"**Priming Lien**" has the meaning given to such term in Section 4.01(c).

"**Related Parties**" with respect to any Person, means such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors, and representatives of it and its Affiliates.

"**Requirement of Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" with respect to any Person, means the chief executive officer, president, or chief financial officer of such Person.

"**Revolving Credit Period**" means the period from and including the Effective Date to the Maturity Date.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Security Agreement**" means the Security Agreement made by Debtor in favor of Lender, dated as of October 30, 2023, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time to the extent permitted under the Loan Documents.

"**Taxes**" means any and all present or future income, stamp, or other taxes, levies, imposts, duties, deductions, charges, fees, or withholdings imposed, levied, withheld, or

4856-5817-0248.6

assessed by any Governmental Authority, together with any interest, additions to tax, or penalties imposed thereon and with respect thereto.

"**Updated Budget**" has the meaning given in the definition of Budget.

"**Use of Cash Collateral**" means, following the Petition Date, any use by Debtor of any Cash Collateral for the payment of any debt, liability, or other obligation of any Debtor (other than to repayment of the Obligations).

**Section 1.02    Interpretation.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof," and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)      Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds.

(d)      All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted

4856-5817-0248.6

pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing Debtor's audited financial statements, except as otherwise specifically prescribed herein.

(e)     For all purposes under the Loan Documents, in connection with any division or plan of division under Oregon law (or any comparable event under a different jurisdiction's laws): (i) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (ii) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II
## THE COMMITMENT AND LOANS

**Section 2.01    Revolving Credit.**

(a)     Lender in its sole and absolute discretion may make Loans to Debtor in amounts such that the aggregate principal amount of all Loans does not exceed (i) prior to the Final DIP Order becoming a Final Order, the Interim Availability Amount and (ii) after the Final DIP Order becomes a Final Order, the Available Revolving Credit. Amounts borrowed pursuant to this Section 2.01 may be repaid and reborrowed during the Revolving Credit Period. The Loans shall (x) bear interest as provided in Section 2.04 and (y) be entitled to the security interests, collateral, and other rights and benefits provided pursuant to the Collateral Documents.

(b)     Debtor shall repay all outstanding Loans on the Maturity Date.

**Section 2.02    Procedures for Revolving Credit Borrowing.** Debtor may request a borrowing under the Credit Facility on any Business Day during the Revolving Credit Period; provided that, Debtor shall deliver to Lender a Borrowing Notice (which Borrowing Notice must be received by Lender no later than 1:00 P.M. Pacific time on the Business Day before the requested Borrowing Date. Each borrowing of Loans under the Credit Facility shall be in an amount not less than $100,000, and not more frequently than weekly.

**Section 2.03    Mandatory Prepayments.** If for any reason the aggregate principal amount of Loans at any time outstanding exceeds (i) prior to the Final DIP Order becoming a Final Order, the Interim Availability Amount and (ii) after the Final DIP Order becomes a Final Order, the Available Revolving Credit, Debtor shall immediately prepay Loans in an amount equal to such excess.

**Section 2.04    Interest.**

(a)     Each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum of 9.75%.

13

4856-5817-0248.6

(b)     If an Event of Default occurs and is continuing, all outstanding Loans shall bear interest at a rate of 12.75% per annum.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date, commencing January 1, 2024.  Debtor, at its option so no as no Event of Default has occurred and is continuing, may elect to pay the interest by capitalizing such interest as additional principal, without further action by Lender, and such capitalized interest will be deemed a Loan under this Agreement.

**SECTION 2.05  Computation of Interest.** All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed.

**SECTION 2.06  Conversion of Loans.**  At any time following the effectiveness of an Acceptable Plan of Reorganization, Lender shall have the right, but not the obligation, to convert the Loans into 100% of the stock of the Debtor.

**ARTICLE III**
**CONDITIONS PRECEDENT**

**Section 3.01    Conditions Precedent to Effectiveness of Agreement and Each Loan.** The effectiveness of this Agreement and the obligation of Lender to make each Loan is subject to the satisfaction of the following conditions precedent (which may only be waived in writing by Lender):

(a)     *Executables*. Lender shall have received:

(i)     this Agreement, duly executed and delivered by an authorized officer of Debtor; and

(ii)     a modification to the Mortgage, executed and delivered by a duly authorized officer of Debtor, reflecting that the Mortgage secures the Obligations.

(b)     *Approvals*. All governmental and third-party approvals necessary in connection with the continuing operations of Debtor, and the transaction contemplated hereby shall have been obtained and be in full force and effect;

(c)     *Interim Orders*. (i) the Interim DIP Order shall have been entered by the Bankruptcy Court in the Case within 14 days of the Petition Date, and (ii) the DIP Orders shall be in full force and effect and shall not have been vacated or stayed in any manner without the prior written consent of Lender.

(d)     *Milestones*. Each of the applicable milestones set forth in Section 6.04 shall have been satisfied or waived in writing by Lender.

(e)     *Representations and Warranties*. Each of the representations and warranties made by Debtor in or pursuant to the Loan Documents shall be true and correct in all material respects (or, as to any representation and warranty that is

14

4856-5817-0248.6

qualified by materiality or Material Adverse Effect, in all respects) on and as of the date such Loan is made as if made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or, as to any representation and warranty that is qualified by materiality or Material Adverse Effect, in all respects)] on such earlier date; and

(f) *No Default*. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

(g) *Fees.* Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the fees and expenses of legal counsel), on or before the Effective Date. All such amounts may be paid with proceeds of Loans made on the Effective Date and if so will be reflected in the funding instructions given by Debtor to Lender on or before the Effective Date;

(h) *Petition Date*. The Petition Date shall have occurred, and the First Day Orders sought by Debtor shall have been entered by the Bankruptcy Court and shall have been in form and substance reasonably satisfactory to Lender.

(i) *Cash Management*. All orders entered by the Bankruptcy Court pertaining to cash management (including the Cash Management Order), and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to Lender.

(j) *Organizational Documents; Resolutions*. Lender shall have received, in form and substance reasonably satisfactory to it, a certificate of Debtor, certified by a secretary of Debtor, dated the date hereof, with appropriate insertions and attachments, including:

(i) a certificate of incorporation, certified by the relevant authority of the jurisdiction of organization of Debtor;

(ii) by-laws, for Debtor, in form and substance satisfactory to Lender, as in effect on the date on which the resolutions referred to below were adopted; and

(iii) resolutions of the board of directors of Debtor approving the transaction, the filing of the Case, and each Loan Document, and of all documents evidencing other necessary corporate action in connection with this Agreement and the Case; and

(k) *Insurance*. Lender shall have received evidence of insurance coverage in form, scope, and substance satisfactory to Lender and otherwise in compliance with the terms of Section 5.02 and Section 6.05 of this Agreement.

15

4856-5817-0248.6

Each borrowing by Debtor hereunder shall constitute a representation and warranty by Debtor, as of the date such Loan is made, that the conditions contained in this ARTICLE III have been satisfied.

## ARTICLE IV
## PRIORITY AND LIENS

**Section 4.01    Status of Obligations; Perfection and Priority of Security Interests.**

(a)    *Superpriority Claims*. The Obligations shall constitute superpriority Administrative Expense claims against the Debtor in the Case, with administrative priority (subject to the Carve-Out and the Orders) and senior-secured status under Section 364(c) and 364(d) of the Bankruptcy Code, entitled (without the need to file a proof of claim), with priority over any and all other claims, Liens, obligations, liabilities, and indebtedness against Debtor, now existing or hereafter arising, of any kind whatsoever, and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by Debtor, and shall at all times be senior to the rights of Debtor, Debtor's estate, and any successor trustee, estate representative, or any creditor in the Case or any subsequent cases or proceedings under the Bankruptcy Code (the "**Lender Superpriority Claim**"). The Lender Superpriority Claim (i) will be considered Administrative Expenses allowed under Section 503(b) of the Bankruptcy Code, (ii) will have recourse to and be payable from all prepetition and postpetition assets of Debtor, including, but not limited to, the Collateral and all proceeds thereof, (iii) will survive conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, and (iv) shall be entitled to the full protections of section 364(e) of the Bankruptcy Code if the Interim DIP Order or the Final DIP Order or any provision hereof or thereof is vacated, reversed, or modified, on appeal or otherwise.

(b)    *Lien on Unencumbered Assets*. The Obligations are, subject to the Carve-Out and the Orders, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority Lien on all Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date and such Liens are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(c)    *Priming Lien on Certain Encumbered Assets*. The Obligations are, subject to the Carve-Out and the Orders, pursuant to section 364(c)(1) and 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien on all the Collateral on which (i) liens were granted as security for the obligations under or in connection with the Prepetition Notes, or (ii) liens were granted as of the Petition Date that are not permitted under this Agreement or (with respect to statutory liens) applicable law, all of which existing liens, rights, and interests (the "**Primed Liens**") shall be primed by and made subject and subordinate to the

16

4856-5817-0248.6

perfected first priority senior lien to be granted to Lender for its and Lender' benefit (the "**Priming Lien**"), which Priming Lien also primes any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens, and such liens are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

  **SECTION 4.02  Carve-Out.** The priorities set forth above are subject, in each case, only to the Carve-Out. All of the liens and security interests described in Section 4.01 shall be effective and perfected as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Debtor shall execute and deliver to Lender (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Lender) to evidence and secure the Obligations.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

  To induce Lender to enter into this Agreement and to make the Loans hereunder, Debtor hereby represents and warrants to Lender that:

  **Section 5.01  Power; Authorization; Enforceability.**

   (a) Debtor has taken all necessary organizational action to authorize the execution, delivery, and performance of the Loan Documents and to authorize the borrowing of Loans on the terms and conditions contained herein. Each Loan Document has been duly executed and delivered by Debtor.

   (b) This Agreement constitutes, and each other Loan Document when delivered hereunder will constitute, subject to the entry of the Final Order, a legal, valid, and binding obligation of Debtor, enforceable against Debtor in accordance with its terms.

  **Section 5.02  No Contravention.** The execution, delivery, and performance of this Agreement and the other Loan Documents, the borrowing of Loans hereunder, and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of Debtor and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or assets pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents). No Requirement of Law or Contractual Obligation applicable to Debtor could reasonably be expected to have a Material Adverse Effect.

  **Section 5.03  Perfected Security Interest.** The Interim DIP Order is (and the Final DIP Order when entered will be) effective to create in favor of Lender a legal, valid, binding, and enforceable perfected security interest in the Collateral and the proceeds and products

17

4856-5817-0248.6

thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as Debtor has any Available Revolving Credit hereunder, or any Loans or any other amounts payable to Lender hereunder or under any other Loan Document have not been paid in full, Debtor shall (except that, in the case of the covenants set forth in Section 6.01 and Section 6.03, Debtor shall furnish all applicable materials to Lender):

**Section 6.01  Financial Statements.** Furnish to Lender, upon Lender's request:

(a)  *Annual Financial Reporting*. When available, a copy of the annual audit report of Debtor for such year including a copy of the audited balance sheet of Debtor as at the end of such year and the related audited statements of income and of cash flows for such year;

(b)  *Quarterly Financial Reporting*. When available, the unaudited balance sheet of Debtor as at the end of each fiscal quarter of Debtor, and the related unaudited statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter; and

(c)  *13-Week Budget*. Each week, an Updated Budget for the Debtor calculated with true, correct and complete data as of the immediately preceding Friday accompanied by a variance analysis to the most recent Updated Budget, including a comparison of actual performance with the Updated Budget for the immediately prior week, and a narrative explaining deviations greater than 10% over Budget on a single line item.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or Responsible Officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

**Section 6.02  Conference Call.** On a weekly basis on a day and time to be mutually agreed upon, Debtor shall, at Lender's request, hold a telephonic conference with Lender and any financial advisor or other consultant of Lender to provide updates relative to (1) the Bankruptcy Case, (2) the Debtor's operating performance, including but not limited to any variances described in Section 6.01(c), and (3) any other relevant matters.

**Section 6.03  Other Information.** Debtor shall furnish the following to Lender upon Lender's request:

(a)  Copies of all notices, requests, and other documents received by Debtor under or pursuant to any Material Contract or instrument, indenture, or loan agreement regarding or related to any breach or default by any party thereto or any other event that could materially impair the value of the interests or the rights of

18

Debtor or otherwise have a Material Adverse Effect, and such information and reports regarding Material Contracts and such instruments, indentures, and loan agreements as Lender may reasonably request from time to time; and

(b)     Such other information respecting the business, condition (financial or otherwise), operations, performance, properties, or prospects of Debtor as Lender may from time to time reasonably request.

**Section 6.04     Chapter 11 Plan Milestones.**

(a)     Not later than the date that is 90 days following the Petition Date, or such other later date acceptable to Lender, Debtor shall file an Acceptable Plan of Reorganization.

(b)     Not later than the date that is 180 days following the Petition Date, or such other later date acceptable to Lender, such Acceptable Plan of Reorganization shall become effective.

**Section 6.05     Maintenance of Insurance.** Maintain insurance with respect to its property and business (including without limitation, property and casualty and business interruption insurance) with financially sound and reputable insurance companies, in such amounts and covering such risks as are usually insured against by similar companies engaged in the same or a similar business.

**Section 6.06     Inspection of Property; Books and Records; Discussions.**

(a)     Keep proper books of records and accounts, in which full, true, and correct entries in all material respects and in any event in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions and assets in relation to its business and activities.

(b)     Permit Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss its business operations, properties, and financial and other condition with its officers and employees and its independent certified public accountants.

**Section 6.07     Use of Proceeds.** Debtor will use the proceeds of the Loans to (a) pay reasonable costs, fees, and expenses of Lender associated with the transactions contemplated by this Agreement and the other Loan Documents, (b) pay for reasonable Administrative Expenses not to exceed the Carve-Out Amount, and (c) provide ongoing working capital requirements of Debtor and to pay for fees, costs, and expenses relating to the Case (other than fees, costs, and expenses referred to in clause (b)), each in accordance with the Budget.

**Section 6.08     Further Assurances.** Promptly upon the request of Lender:

4856-5817-0248.6

(a)        Correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgement, filing, or recordation thereof.

(b)        Do, execute, acknowledge, deliver, record, re-record, file, re-file, register, and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances, and other instruments as Lender may reasonably require from time to time in order to:

(i)        carry out more effectively the purposes of the Loan Documents;

(ii)        to the fullest extent permitted by applicable law, subject Debtor's properties, assets, rights, or interests to the Liens now or hereafter intended to be covered by the Collateral Documents and the other Loan Documents;

(iii)        perfect and maintain the validity, effectiveness and priority of the Liens intended to be created under the Collateral Documents and the other Loan Documents; and

(iv)        assure, convey, grant, assign, transfer, preserve, protect, and confirm more effectively to Lender, the rights granted or now or hereafter intended to be granted to Lender under any Loan Document or under any other instruments executed in connection with any Loan Document to which Debtor is or is to be a party.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as Lender has any Available Revolving Credit hereunder, or any Loans or any other amounts payable to Lender hereunder or under any other Loan Document have not been paid in full, Debtor shall not without Lender's consent:

**Section 7.01    Limitation on Debt.** Create, incur, assume, permit to exist, or otherwise become liable with respect to any Debt, except:

(a)        Debt of Debtor existing or arising under this Agreement and any other Loan Document; and

(b)        Debt existing on the date hereof.

**Section 7.02    Limitation on Liens.** Create, incur, assume, or permit to exist any Lien on any property or assets now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except:

(a)        Liens created pursuant to or arising under any Loan Document;

4856-5817-0248.6

(b)     Liens imposed by law for taxes, assessments, or governmental charges not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted if, unless the amount is not material with respect to it or its financial condition, adequate reserves with respect thereto are maintained in accordance with GAAP on the books of the applicable Person;

(c)     Carriers', warehousemen's, mechanics', materialmen's, repairmen's, and other similar Liens imposed by law, arising in the ordinary course of business, and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted;

(d)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens rights or set-off or similar rights;

(e)     Pledges and deposits and other Liens (i) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance, and other social security laws or regulations and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty, or liability insurance to Debtor;

(f)     Liens (including deposits) to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, and other obligations of like nature, in each case in the ordinary course of business;

(g)     Easements, zoning restrictions, rights-of-way, minor defects or irregularities in title, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that, in the aggregate, are not material in amount and which do not materially detract from the value of the affected property or interfere materially with the ordinary conduct of business of Debtor; and

(h)     Liens in existence as of the date hereof.

**Section 7.03    Mergers; Nature of Business.**

(a)     Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve.

(b)     Engage in any business other than businesses of the type conducted by Debtor on the date hereof and businesses reasonably related thereto.

**Section 7.04    Limitation on Investments.** Make any advance, loan, extension of credit (by way of guaranty or otherwise), or capital contribution to, or purchase, hold, or acquire any Equity Interests, bonds, notes, debentures, or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "**Investments**"), except:

(a)     Investments in Cash Equivalents; and

4856-5817-0248.6

(b)     Investments existing on the date hereof; and

(c)     Extensions of trade credit in the ordinary course of business (including any instrument evidencing the same and any instrument, security, or other asset acquired through bona fide collection efforts with respect to the same).

**Section 7.05    Limitation on Dispositions.** Dispose of any of its property, whether now owned or hereafter acquired, or issue or sell any Equity Interests to any Person, except:

(a)     The sale or Disposition of machinery and equipment no longer used or useful in the business of Debtor;

(b)     The Disposition of obsolete or worn-out property in the ordinary course of business;

(c)     The sale of inventory and immaterial assets in the ordinary course of business; and

(d)     Dispositions of cash permitted by the Cash Management Order.

**Section 7.06    Additional Bankruptcy Matters**. Do any of the following:

(a)     *Certain Payments*. Except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First Day Order or "second day" order complying with the terms of this Agreement) or as provided pursuant to any other order of the Bankruptcy Court, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business.

(b)     *DIP Order Amendments*. Make or permit to be made any changes to the Interim DIP Order or the Final DIP Order, unless approved by Lender.

(c)     *Alternative Reorganization Plans*. File or support the confirmation of any Plan of Reorganization or liquidation other than an Acceptable Plan of Reorganization.

(d)     *New Liens*. Grant any new Liens in favor of any Person (other than Lender) on any of the Collateral, or seek to prime any Lien of Lender on any of the Collateral.

(e)     *Budget*. Allow Use of Cash Collateral as of any week to exceed the aggregate amount of operating and non-operating disbursements permitted for such week as set forth in the Budget.

4856-5817-0248.6

Case 23-62260-dwh11    Doc 12    Filed 12/04/23

Case 23-62260-dwh11    Doc 29    Filed 12/08/23

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default.** Each of the following events or conditions shall constitute an "**Event of Default**" (whether it shall be voluntary or involuntary or come about or be affected by any Requirement of Law or otherwise):

(a)    *Payment Default*. Debtor fails to pay any principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment, or otherwise;

(b)    *Failure of Representation or Warranty*. Any representation, warranty, certification, or other statement of fact made or deemed made by or on behalf of Debtor herein or in any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder or in any certificate, document, report, financial statement, or other document furnished by or on behalf of Debtor under or in connection with this Agreement or any other Loan Document, proves to have been false or misleading in any material respect on or as of the date made or deemed made and such failure causes, or is likely to cause, a Material Adverse Effect;

(c)    *Breach of Affirmative/Negative Covenants*. Debtor fails to perform or observe any covenant, term, condition, or agreement contained in Section 6.07 or Article 7;

(d)    *Other Covenants, Terms, and Conditions*. Debtor fails to perform or observe any other covenant, term, condition, or agreement contained in this Agreement or any other Loan Document (other than as provided in subsections (a) through (c) of this Section 8.01) and such failure continues unremedied for a period of 15 days after written notice to Debtor from Lender;

(e)    *Lack of Security Interest*. Any Lien created under the Interim DIP Order or the Final DIP Order, as applicable, or any other Collateral Document, ceases to be, or is asserted by Debtor not to be, a valid and perfected lien, with the priority required by the applicable Collateral Document, Interim DIP Order, or Final DIP Order, as the case may be, except as a result of a disposition of the applicable collateral in a transaction permitted under this Agreement or as otherwise expressly permitted hereunder or under the applicable Collateral Document.

(f)    *Surcharge*. The Lender or the Collateral is surcharged pursuant to sections 105, 506(c), or any other section of the Bankruptcy Code.

(g)    *Dismissal of Cases; Appointment of Trustee*. The Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Debtor files a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; or a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code is appointed in the

4856-5817-0248.6

Case. Any order by the Bankruptcy Court is entered terminating or modifying the exclusivity right of Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

(h)     *Superpriority Claims*. An order of the Bankruptcy Court is entered granting any to any Person in the Case a claim, lien, or security interest that is pari passu with or senior to the claims, liens, or security interests of Lender against Debtor hereunder (including the Lender Superpriority Claim), or Debtor takes any action seeking or supporting the grant of any such claim, lien, or security interest, in each case except as expressly permitted hereunder.

(i)     *Final DIP Order*. The Final DIP Order is not have been entered by the Bankruptcy Court and become a Final Order within 45 days after the entry of the Interim DIP Order.

(j)     *Avoidance*. An order of the Bankruptcy Court shall be entered avoiding any portion of the payments made on account of the Obligations.

(k)     *Challenge to Order*. The Interim DIP Order or Final DIP Order, as applicable, fails to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Order or Final DIP Order, (ii) amending or modifying the Interim DIP Order or Final DIP Order in a manner that is adverse to Lender, or (iii) staying for a period in excess of seven days the Interim DIP Order or Final DIP Order (as applicable).

(l)     *Relief from the Automatic Stay*. The Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to allow any one or more creditors to execute upon or enforce liens on or security interests in any assets of Debtor that have a fair market value in excess of $100,000 in the aggregate.

(m)     *Compliance with Orders*. Debtor shall fail to comply, in any material respect, with the terms of the Orders.

(n)     *Prepetition Payments*. Debtor makes any Prepetition Payments other than (i) as permitted by the Interim DIP Order or the Final DIP Order, (ii) as otherwise permitted by this Agreement, (iii) as otherwise ordered or authorized by the Bankruptcy Court and agreed in writing by Lender in its sole discretion.

(o)     *Sale of Assets*. The Bankruptcy Court shall enter, an order authorizing the sale of any material portion of Debtor's assets (unless, in the case of each of the foregoing, either (i) (A) Lender consents to the filing of such motion, and (B) any order approving the sale expressly provides for application of cash proceeds in accordance with the terms of this Agreement and is otherwise in form and substance reasonably acceptable to Lender or (ii) the order approving such sale contemplates payment in full in cash of the Obligations upon consummation of such sale).

(p)     *Chapter 11 Milestones*. The failure of Debtor to perform any of its obligations under Section 6.04 by the times specified therein.

4856-5817-0248.6

(q)     *Plan of Reorganization*. If a Plan of Reorganization that is not an Acceptable Plan of Reorganization is approved by the Bankruptcy Court.

(r)     *Actions in Support of Breach*. Debtor files any application or pleading with the Bankruptcy Court or otherwise consents to any matters set forth above that would constitute an Event of Default (unless Lender consents to such filing or consent).

(s)     *Judgments*. One or more judgments or decrees is entered against Debtor by a court of competent jurisdiction that results in, or is likely to result in, a Material Adverse Effect, and all such judgments or decrees have not been vacated, discharged, stayed, or bonded pending appeal within 30 days from the entry thereof;

(t)     *Loan Documents*. Any material provision of any Loan Document ceases for any reason to be valid, binding, and in full force and effect, other than as expressly permitted hereunder or thereunder; and

(u)     *Change of Control*. Any Change of Control occurs.

**Section 8.02    Remedies Upon Event of Default.** If any Event of Default occurs and is continuing, then Lender may, at Lender's election and sole discretion:

(a)     By notice to Debtor, declare the Available Revolving Credit to be terminated forthwith, whereupon the Available Revolving Credit shall immediately terminate;

(b)     By notice to Debtor, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable;

(c)     Terminate Debtor's ability to use the cash collateral provided for by the Interim DIP Order or the Final DIP Order (provided that Debtor shall, so long as no funds are otherwise available, at all times being permitted to pay professional fees out of amounts on deposit in the Carve-Out Reserve Account in accordance with the Carve-Out approved in the Interim DIP Order and the Final DIP Order, as applicable); and/or

(d)     Exercise on behalf of itself and Lender all rights and remedies available to it and Lender under the Loan Documents, the Interim DIP Order, and upon entry of the Final DIP Order, the Final DIP Order, or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code.

Debtor shall not seek to enjoin, hinder, delay, or object to Lender's exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to Lender's exercise of rights and remedies, Debtor cannot raise any

4856-5817-0248.6

substantive objections, other than to challenge the occurrence of the relevant Event of Default as provided in Section 8.03.

Section 8.03    **Affidavit Following Event of Default**. Without limiting Section 8.02, upon the occurrence of any Event of Default, Lender may, in its sole discretion, file an affidavit with the Bankruptcy Court certifying the occurrence of such Event of Default. Lender shall, contemporaneously with the filing of any such affidavit with the Bankruptcy Court, serve via e-mail a copy of the affidavit on Debtor and its counsel, the U.S. Trustee's office, and counsel for any official creditors' committee. Contemporaneously with the filing and service of any such affidavit, Lender may request (and Debtor shall cooperate in scheduling) an expedited hearing regarding relief from the automatic stay for Lender to enforce its rights and remedies under the Loan Documents and applicable law. Debtor agrees that such expedited hearing may be heard as early as four Business Days after Lender files such affidavit. Debtor may file a response with the Bankruptcy Court opposing relief from the automatic stay, which response must be limited to whether an Event of Default has occurred that has not been cured. Debtor agrees that if the Bankruptcy Court determines that an uncured Event of Default has occurred, the Bankruptcy Court may enter an order terminating the automatic stay so that Lender may enforce its rights and remedies. If Debtor fails to file a response, the Bankruptcy Court may enter an order terminating the automatic stay, which Debtor agrees may be entered.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01    **Notices.**

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (or by e-mail as provided in paragraph (b) below), all notices and other communications provided for herein shall be made in writing and mailed by certified or registered mail, delivered by hand or overnight courier service, or sent by facsimile as follows:

(i)    If to Debtor, to it c/o Clyde Hamstreet and Associates at One SW Columbia St., Suite 1575, Portland, OR 97204, Attention of Clyde Hamstreet, with a copy to Tim Conway (tim.conway@tonkon.com).

(ii)    If to Lender, to them at 9899 NW 316th Place, Hillsboro, Oregon 97124, with a copy to Garrett Ledgerwood (Garrett.Ledgerwood@MillerNash.com).

Notices mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received. Notices sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next Business Day).

4856-5817-0248.6

(b)　　Notices and other communications to Lender hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by Lender. Lender or Debtor (on behalf of Debtor) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that, approval of such procedures may be limited to particular notices or communications.

(c)　　Unless Lender specifies otherwise:

(i)　　notices and other communications sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgment); and

(ii)　　notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor;

provided that, if such notice, e-mail or other communication is not sent during the recipient's normal business hours, such notice, e-mail, or communication shall be deemed to have been sent at the recipient's opening of business on the next Business Day.

(d)　　Either party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other party.

**Section 9.02　Amendments and Waivers.**

(a)　　No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power, or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law. No waiver of any provision of any Loan Document or consent to any departure by Debtor therefrom shall in any event be effective unless the same shall comply with paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether Lender may have had notice or knowledge of such Default at the time.

(b)　　Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, or modified except by Debtor and Lender.

4856-5817-0248.6

**Section 9.03    Expenses; Damage Waiver.**

(a)    Debtor agrees to pay:

(i)    all reasonable out-of-pocket expenses incurred by Lender, including the reasonable fees, charges, and disbursements of counsel for Lender in connection with the preparation, negotiation, execution, delivery, and administration of the Loan Documents and any amendments, waivers, or other modifications of the provisions of any Loan Document (whether or not the transactions contemplated by the Loan Documents are consummated) and;

(ii)    all out-of-pocket expenses incurred by Lender, including the fees, charges, and disbursements of any counsel for Lender, in connection with the enforcement or protection of its rights (i) in connection with the Loan Documents, including its rights under this Section 9.03 or (ii) in connection with the Loans issued under this Agreement.

(b)    Debtor agrees, to the fullest extent permitted by applicable law, not to assert, and hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential, or punitive damages (including, without limitation, any loss of profits or anticipated savings), as opposed to actual or direct damages, resulting from this Agreement or any other Loan Document or arising out of such Indemnified Party's activities in connection herewith or therewith (whether before or after the Effective Date).

(c)    All amounts due under Section 9.03 shall be payable not later than five Business Days after demand is made for payment by Lender.

**Section 9.04    Successors and Assigns.**

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Debtor may not assign or otherwise transfer any of its rights or obligations hereunder (and any attempted assignment or transfer by Debtor without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of Lender) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

(b)    Lender may, at any time, without the consent of Debtor, assign to one or more Eligible Assignees (as defined below) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Available Revolving Credit and the Loans at the time owing to it). For purposes of this Agreement, "**Eligible Assignee**" means any Person other than a natural Person that is (i) an Affiliate of Lender, (ii) a commercial bank, insurance company, investment or mutual fund, or other Person that is an "accredited investor" (as defined in Regulation D under the Securities Act), or (iii) a corporate entity that possesses

4856-5817-0248.6

financial wherewithal similar to that of Lender. Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 9.03). Debtor hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an Lender to act on behalf of such lenders. Any assignment or transfer by Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

Section 9.05    Survival. All covenants, agreements, representations, and warranties made by Debtor in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Available Revolving Credit has not expired or terminated. The provisions of ARTICLE IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Available Revolving Credit, or the termination of this Agreement or any provision hereof.

Section 9.06    Counterparts; Integration; Effectiveness.

(a)    This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to Lender constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect to the subject matter hereof. Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by Lender and when Lender shall have received a counterpart hereof executed by Debtor. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

4856-5817-0248.6

(b)     The words "execution," "signed," "signature," and words of similar import in any Loan Document shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 USC § 7001 et seq.), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA, including the New York Electronic Signatures and Records Act (N.Y. Tech. §§ 301 to 309).

**Section 9.07    Severability.** If any term or provision of any Loan Document is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision thereof or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 9.08    Right of Setoff.** If an Event of Default shall have occurred and be continuing, Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender or Affiliate to or for the credit or the account of Debtor against any and all of the obligations of Debtor now or hereafter existing under the Loan Documents to Lender or its Affiliates, whether direct or indirect, absolute or contingent, matured or unmatured, and irrespective of whether or not Lender or any Affiliate shall have made any demand under the Loan Documents and although such obligations of Debtor are owed to a branch, office, or Affiliate of Lender different from the branch, office, or Affiliate holding such deposit or obligated on such indebtedness. Lender agrees to notify Debtor promptly after any such set off and appropriation and application; provided that the failure to give such notice shall not affect the validity of such set off and appropriation and application.

**Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.**

(a)     This Agreement and the other Loan Documents and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Oregon, without regard to conflicts of laws principles.

(b)     Debtor irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against Lender or any of its Related Parties in any way relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, in any forum other than the Bankruptcy Court, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation, or proceeding

4856-5817-0248.6

may be brought in any such court. Each of the parties hereto agrees that a final judgment in any such action, litigation, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Debtor or its properties in the courts of any jurisdiction following relief from the automatic stay.

(c)     Debtor irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any such court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Debtor irrevocably consents to the service of process in the manner provided for notices in Section 9.01 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

Section 9.10    New Value. It is the intention of the Debtor and Lender that the granting of the Collateral to Lender as a condition to and in connection with the making of the Loan by Lender be and is a contemporaneous exchange for new value given by Lender to Debtor.

Section 9.11    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE, OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.12    No Fiduciary Duties. Lender may have economic interests that conflict with those of the Debtor and its stockholders. The Debtor agrees that nothing in the Loan Documents or otherwise related to the transactions contemplated thereby will be deemed to create an advisory, fiduciary, or agency relationship or fiduciary or other implied duty between Lender, on the one hand, and Debtor, on the other hand. The parties hereto acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial between Lender, on the one hand, and Debtor, on the other hand, and (ii) in connection therewith and with the process leading thereto, (x) Lender has not assumed an advisory or fiduciary responsibility in favor of the Debtor or its stockholders with respect to

31

the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto or any other obligation to Debtor except the obligations expressly set forth in the Loan Documents and (y) Lender is acting solely as principal and not as the agent or fiduciary of Debtor or its stockholders, affiliates, creditors or any other Person. Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

      **Section 9.13   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY THE LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY ANY BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY US TO BE ENFORCEABLE.**

[SIGNATURE PAGE FOLLOWS]

4856-5817-0248.6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**VAN'S AIRCRAFT, INC.,**
an Oregon Corporation


By: _____
Name:
Title:


_____
Richard E. Van Grunsven, as Trustee of the Richard E. Van Grunsven and Diana E. Van Grunsven Trust


_____
Diane E. Van Grunsven, as Trustee of the Richard E Van Grunsven and Diana E. Van Grunsven Trust

33