Timothy J. Conway, OSB No. 851752
   Direct Dial: (503) 802-2027
   Email: tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
   Direct Dial: (503) 802-2169
   E-Mail: michael.fletcher@tonkon.com
Ava Schoen, OSB No. 044072
   Direct Dial: (503) 802-2143
   Email: ava.schoen@tonkon.com
Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
Main: 503.221.1440
Facsimile: 503.274.8779

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Van's Aircraft, Inc.,<br><br>        Debtor. | Case No. 23-62260-dwh11<br><br>**DEBTOR'S AND WORLDPAY, LLC'S JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN**<br><br>***EXPEDITED CONSIDERATION REQUESTED*** |

Van's Aircraft, Inc., debtor and debtor-in-possession ("Debtor") and Worldpay, LLC, ("Worldpay") jointly move this Court for an order approving Debtor's assumption of the Merchant Processing Agreement between Debtor and Worldpay (the "MPA") as set forth herein, and allowing Worldpay a general unsecured claim with respect to the assumption of the MPA as described below, and in support thereof, state as follows:

1. On December 4, 2023, Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Petition Date").

**Page 1 of 3** – JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN

2. Debtor remains in possession of its assets and continues to operate its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3. The relief requested herein by Debtor is based on the Court's authority pursuant to 11 USC §§ 105(a) and 365.

4. On or about February 13, 2019, Debtor and Worldpay (or its predecessor, Vantiv, LLC) entered into an MPA, a copy of which is attached (without confidential terms and conditions) hereto as **Exhibit 1**.

5. As of the Petition Date, Debtor and Worldpay had fully and promptly performed all of their respective obligations under the MPA.

6. On April 5, 2024, Worldpay filed a proof of claim as a general unsecured creditor (claim no. 554) in the sum of $238,440.03 for certain unpaid and/or unrecouped chargebacks by Debtor's customers on credit and debit card transactions with Debtor that occurred prior to the Petition Date and that Worldpay has or will cover by payment or credit back to the disputing customers' accounts, along with chargeback-related fees and regular charges and fees accrued and payable to Worldpay for its pre-petition credit and debit card processing services ("Unsecured Claim").

7. Worldpay may amend its Unsecured Claim to include additional chargeback requests by Debtor's customers for debit and credit card transactions that occurred prior to the Petition Date (and associated fees for the processing of the same), and for which Worldpay is responsible for no less than six (6) months after the Petition Date, or to and through at least June 2024 ("Amended Unsecured Claim").

8. Debtor and Worldpay desire to continue the terms of the MPA and provide for Debtor to assume the MPA pursuant to Debtor's Plan of Reorganization Pursuant to Subchapter V Under Chapter 11 (March 29, 2024) or such other plan as confirmed by the Court ("Plan").

9. As a condition to Debtor assuming the MPA, Debtor and Worldpay have agreed (i) that the cure amount and compensation to Worldpay required under 11 USC § 365 for the

Page 2 of 3 –  JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 135    Filed 05/10/24

assumption shall be limited to treatment of Worldpay's Unsecured Claim as an Allowed Class 5 Claim under the Plan and (ii) to allow Worldpay to file one or more Amended Unsecured Claims, any of which will be treated under the Plan as a Class 5 Claim to the extent Allowed. No other cure payment or adequate assurance is required.

10. Any charges or claims of Worldpay for unpaid and/or unrecouped chargebacks by the Debtor's customers on credit and debit card transactions with Debtor that have occurred or may occur after the Petition Date shall be treated under the terms of the MPA and shall be paid and resolved in accordance with the terms of the MPA.

11. In Debtor's business judgment, it is in the best interest of Debtor, its creditors, and its estate for Debtor to assume the MPA pursuant to the terms herein.

12. Attached hereto as **Exhibit 2** is a proposed order granting Debtor's Motion.

13. WHEREFORE, Debtor prays that this Court enter an order approving Debtor's assumption of the MPA with Worldpay in accordance with the terms set forth above.

DATED: May 10, 2024.

TONKON TORP LLP

By /s/ Ava Schoen
    Timothy J. Conway, OSB No. 851752
    Michael W. Fletcher, OSB No. 010448
    Ava Schoen, OSB No. 044072
    Attorneys for Debtor

AND

ARNALL GOLDEN GREGORY LLP

By /s/ Frank White
    Frank N. White
    Attorney for Creditor Worldpay, LLC

Page 3 of 3 – JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 135    Filed 05/10/24

# EXHIBIT 1

Merchant Processing Agreement

# Merchant Processing Agreement
# Terms and Conditions

These Terms and Conditions apply to your card processing program. For simplicity, we refer to ourselves (i.e., Worldpay, LLC) as "Processor", "we", "our", or "us" in this document. We refer to you (i.e., the legal entity or sole proprietorship on the Application) as "you" or "your" or "Merchant." Other parties may also be parties to this Agreement (e.g., Member Bank, Guarantor, etc.). Terms that are capitalized but not defined are defined in Section 17.

**1. Term and Exclusivity.**
   A. **Term.** This Agreement binds you on the earlier of your execution of this Agreement or your submission of a transaction for processing. This Agreement binds us the earlier of (i) the date we issue you a Merchant Identification Number; or (ii) the date we process your first transaction. Unless otherwise stated in the Agreement/Application, the term of this Agreement is 36 months ("Initial Term"). Following the end of any term, the Agreement automatically renews for periods of 36 months, unless either party gives written notice of its intent to terminate or not renew the Agreement at least 90 days before the then-current term expires, provided that if automatic renewal of this Agreement violates the provisions of applicable law, the renewal term will be 30 days. For clarity, termination of this Agreement does not terminate your equipment lease.
   B. **Exclusivity.** This Agreement is a "requirements contract." This means you shall exclusively receive the Services from us. However, we have no obligation to process a Visa or MasterCard transaction beyond the authority of a U.S. member of Visa and MasterCard, or to process Discover or American Express transactions outside the United States. Prior to exercising any right of termination or non-renewal, you agree that we shall have a right of first refusal before you enter into an agreement with a third party for the Services. Except for term length, you agree that our right includes terms and conditions that are substantially similar to those discussed with the third party.

**2. Rules, Regulations and Laws.** As part of this Agreement, you agree to comply with, and to cause your employees and agents to comply with: (i) the Laws; (ii) the Rules Summary; (iii) the Operating Regulations and terminal update requirements related to optional Association programs, if applicable (and any related costs); and (iv) the confidentiality and security requirements of (a) USA Patriot Act and any related laws, rules, or regulations; and (b) the Associations and Networks, including the Payment Card Industry Data Security Standard, the VISA Cardholder Information Security Program, the MasterCard Site Data Protection Program, the American Express Data Security Requirements (DSR), and any other Association or Network program or requirement. You accept any responsibility or liability (e.g., data breach liability) resulting from your decision not to participate in optional Association Programs (e.g., the Association EMV program).

**3. Acceptance of Cards.**
   A. You can elect to accept all card types, or only certain Visa and MasterCard card types (**"Limited Acceptance"**). You are solely responsible for your Limited Acceptance program. This includes: (i) policing card types at the point of sale; (ii) paying Association fees and charges for only accepting certain card types; and (iii) paying any costs we incur in connection with your Limited Acceptance. Our obligations are limited to those expressed in the Operating Rules. Should you submit a transaction for processing for a card type you have indicated you do not wish to accept, we may process that transaction and you agree to pay any applicable fees, charges, and assessments. The card types are: (i) "Debit Card" -- U.S. and non-U.S. bank issued Visa or MasterCard Cards that access consumer asset accounts within 14 days of purchase, including stored value, prepaid, EBT, gift, or consumer check Cards; (ii) "Other Card" -- all Visa and MasterCard Cards issued by a non-U.S. bank and all Visa and MasterCard Cards other than Debit Cards, including business and consumer credit Cards. Your Limited Acceptance program only applies to U.S.-issued cards. The Visa and MasterCard Operating Regulations require merchants accepting any Card product bearing a Visa or MasterCard symbol to continue accepting both debit and credit Card products issued by non-U.S. members.
   B. If we are unable to obtain, or choose not to obtain, authorization from an Association or Other Network, we may "stand-in" for the Association or Other Network. If we stand-in, we will authorize the Card transaction based on our own criteria. Our decision to stand-in does not change your obligation(s) to us.

**4. Our Responsibilities.**
   A. We will provide the Services in accordance with our then-current systems, standards, and procedures. Nothing requires us to provide you with any special programming; any system, program, or procedure implementation; or any special hardware or software.
   B. We will provide reports online for each fiscal day's activity by 10:00 AM ET the next calendar day. Such reports will include an accounting for each currency with supporting detail of transaction activity, Daily Proceeds, reserves and funds transfers for transaction settlement services. Reports will be available for download on the online reporting tool for a period of 14 months from the date of issue. Reports may be upgraded, enhanced and/or modified by us at any time.
   C. We will initiate payment to you for the amount of each accepted Card transaction only after we receive payment.
   D. We have the right to honor and rely on the request(s) or instruction(s) of any person we reasonably believe to be your representative or Agent. In the event we receive returned mail intended for you, we may, but are not required to, procure a replacement address according to our standard operating procedures.
   E. We are only responsible for processing credits and adjustments for Card transactions that we originally processed. You authorize us to audit all Card transactions and deposits. We have the right to withhold amounts from you if we discover inaccuracies.
   F. We may report information about your account, late payments, missed payments, or defaults to credit bureaus.
   G. We may suspend or cease providing any Services to you in response to a Member Bank, Network, or Association request. We will use reasonable efforts to notify you if we suspend or cease any Services.
   H. We are responsible for the security of Cardholder data we store or transmit on your behalf only while it is in our possession and control.

**5. Your Responsibilities.**
   A. We have the right to charge your Designated Account without notice or to require payment from you in any appropriate situation for the amount of any Card transactions. This right includes Card transactions: (i) where merchandise is returned; (ii) where there is no valid authorization response; (iii) where the Cardholder has not given authority (e.g., improperly drawn, accepted, or endorsed transactions); (iv) where the Card transaction record is illegible; (v) where the Cardholder disputes the sale, quality, or delivery of merchandise or performance or quality of services; (vi) where the Card transaction was drawn by, or depository credit given to, you in a way that breaches the agreement or violates the Laws or Operating Regulations; (vii) where we have not received and retained payment for the Card transaction (even if we have already paid you for the transaction); (viii) where it is alleged that you have failed to comply with the Operating Regulations, Rules Summary, or the Laws; (ix) where an Association or Other Network action (e.g., a chargeback or compliance case) is pending or has been resolved against you; (x) where we have incurred claims, damages, or losses from any source including Card issuers, or (xi) where the extension of credit for a Card transaction violated the Laws or Operating Regulations. Additionally, you remain fully liable to us for any transaction returned to us for any reason (**"chargebacks"** or for PIN debit Card transactions, **"reversals"**). You agree to review all chargeback-related notices and reports (in any format). Your failure to respond to a chargeback or reversal within the applicable deadline may forfeit your chargeback rights. We have no duty to assist you in defending a non-compliance allegation related to a chargeback or reversal.
   B. You represent that any information you have supplied to us is true and accurate and that the name and tax identification number ("TIN") on the Application matches the name and TIN that you use to file your tax returns. You agree to update your information with us when it changes. We may need to share your TIN, entity name, processing volume, principal's social security number, or other information with governmental entities. You agree to cooperate with our requests for information for any reason. We may be required to withhold processing funds or to forward processing funds to the IRS if you supply incorrect information, or a state or federal law or government agency so requires. You expressly release us from any liability in connection with our withholding of funds or submission of information to a government agency, even if incorrect. You are responsible for any fines or penalties assessed against you or us.
   C. You shall not sell, purchase, provide, share, or exchange Cardholder name, address, account number, or other information to any third party (including your Agent) other than us, the Associations, or the Networks, and then only for the purpose of completing a Card transaction.
   D. You agree to balance and reconcile the Designated Account and the Reserve Account each day. You shall immediately notify us of any missing or improperly deposited funds. Additionally, you agree to review our (or our agents') reports (including those made available online), notices, and invoices. You agree to accept any report, notice, invoice, Service deficiency, or billing or payment error if you fail to reject or dispute it in writing within 30 days of the date we made it available to you. We may make our reports, notices and invoices available to you in accordance with our standard processes, which are subject to change. For 60 days following our receipt of your written notice of an error or deficiency, you agree to refrain from making any loss or expense claims against us so that we have time to investigate the situation. If you notify us that a Card transaction batch has not processed, we may, at our option, attempt to re-present the missing Card batches dated during the 90 day-period preceding the date we received your notice. We have no obligation to correct any errors that flow from your failure to comply with the duties and obligations in this paragraph.
   E. You shall not sell, assign, transfer, or encumber any part of your interest in the Reserve Account, or any present or future rights under this Agreement, including your right to receive payments or funds. Neither we nor Member Bank are obligated to honor any purported attempt to sell, assign, transfer, or encumber any interest, rights, payments, or funds. In the event you breach this Section, we have the right to withhold funds payable to you, in addition to any other rights we may have at law or equity. You shall indemnify and hold us harmless from and against any claims, liabilities and damages that any person (including a purported assignee) may assert against us arising out of your purported sale, assignment, transfer, or encumbrance of all or any of your present or future rights under this Agreement.
   F. You agree to provide us with audited annual financial statements for your business using generally accepted accounting principles, at any time upon request. Additionally, you agree to provide any other financial information within fifteen days of a request by us.
   G. You shall timely assist us in complying with all Laws and Operating Regulations related to the Services. This obligates you to execute and deliver all instruments we deem necessary for you to meet your obligations under the Agreement. Further, you agree to allow our auditors (third-party or internal), and the auditors of any Association or Other Network, to review the documents, records, procedures, systems, controls, equipment, and physical assets related to your transactions upon reasonable notice at any time. You also agree to assist our auditors as necessary. If an Association, Member Bank, or regulatory agency requires a third-party audit, or if the Operating Regulations or applicable law requires a third-party audit, we may retain a third party to perform the audit or require you to immediately retain a specific third-party auditor and provide us with a final audit report. You agree to pay our audit costs or the audit costs of Member Bank, an Association, or Other Network.
   H. In the case of a delayed merchandise delivery, you agree to deliver the Card transaction record to us within two business days of the merchandise delivery (or as we specify in the Rules Summary). You agree to electronically deliver all other Card transactions and credit records to us in a suitable format within two business days of the transaction (unless the Associations or Networks require the records earlier). You also agree to deliver Card transactions and credit records to us at least once every business day. Your delivery constitutes an endorsement of each recorded transaction. You authorize us or our representative to place your endorsement on any Card transaction at any time. We have the right to refuse to acquire any Card transaction. You waive notice of dispute related to any individual Card transaction.
   I. You shall not store Cardholder data, including track-2 data, in violation of the Laws or the Operating Regulations. Further, you shall not retain or store magnetic stripe data following the authorization of a Card transaction.
   J. You are solely responsible for the quality, accuracy, and adequacy of all transactions and information you supply. Accordingly, you shall implement and maintain adequate audit controls for monitoring the quality and delivery of data. When submitting Card transaction, settlement, and other data and information to us, you agree to follow our communications processes and document formats. You agree to only transmit information and data to us with a secure system.
   K. You may use a third-party agent ("**Agent**") to perform some of your obligations under this Agreement, subject to our approval. Agents include your software providers and equipment providers. You shall cause your Agent to complete any Association-required steps or certifications (e.g., registrations, PABP, PCI-DSS, audits, etc.). You shall ensure that your

Agent complies with all applicable requirements of this Agreement. You expressly assume all responsibility for the acts or omissions of your Agent as if they were your acts or omissions. If your Agent qualifies as a service provider under applicable Operating Regulations, you agree, at your expense, to cause the Agent to cooperate with us in our due diligence requests, and in performing any steps required for registration and certification. You are responsible for conducting your own due diligence on your Agents, including the fitness of their services for a particular purpose and for determining the compliance of their services with the Operating Regulations and the Laws. You expressly assume all liability for the acts and/or omissions of your Agent even if we introduce or recommend the Agent, or resell the Agent's services.

L. You agree that it is important to notify us about changes in your business. Because of this, you agree to provide us 30 days prior written notice of your intent: (i) to change business form or entity type; (ii) to sell stock or assets to another entity; or (iii) to make changes that would affect information on the Merchant Application. Additionally, you shall notify us within three days of any judgment, writ, warrant of attachment, execution, or levy against any substantial part (25% or more) of your assets. Should you change or add locations, you agree to follow our standards and procedures. Unless we agree otherwise, you agree that you will only present Card transactions to us that correspond to the activities and volumes described on the Merchant Application. Accordingly, we must pre-approve increases in Card transaction volume of 25% or more over the amount stated in the Merchant Application. Changes in monthly volume, the stated average ticket size, or any other information on the Merchant Application entitle us to increase fees, delay or withhold settlement, or terminate this Agreement. Your failure to notify us of changes under this Section subjects you to liability for any losses or expenses we incur.

M. **Virtual Private Network ("VPN")/Secure Socket Layer ("SSL") Services.** Our standard VPN and SSL services establish an internet connection between you and us for processing your transactions. You are responsible for: (i) ensuring that your communication equipment is compatible with our VPN or SSL; (ii) ensuring that each terminal with a connection to the VPN or SSL has an active personal firewall; and (iii) ensuring a secure key exchange and key management process (including a process for key revocation when your personnel leave). Our VPN or SSL communication interface relies on the internet. You agree that the internet is not always reliable, and that internet problems and issues may interfere with our ability to process your transactions. Any service levels that appear in other parts of the Agreement do not apply to the VPN or SSL connection or to transactions transmitted using the VPN or SSL connection. We provide VPN and SSL services in accordance with our own standards, which are subject to change without notice. You agree to comply with any VPN and SSL standards we or the Associations or Other Networks establish.

N. **Optional Services.** We may offer you products and services through one or more third parties **("Optional Services")**. You agree that, as available, the applicable third-party provider ("Provider") solely supplies and/or supports all Optional Services. We are not a party to your contracts with Providers. You are responsible for conducting your own due diligence on any Provider that you use, including the fitness of its services for a particular purpose and for determining the compliance of its services with the Operating Regulations and the Laws, even if we resell the Provider's services. You bear all of the risks associated with using an Optional Service. Although not an exhaustive list, we are not liable for: (i) exercising control over Provider; (ii) errors related to establishing and maintaining account relationships with Providers; or (iii) ensuring service levels with respect to the Optional Service(s). Our decision to offer any Optional Service shall not limit your duty to: (i) ensure that all account numbers are correct; (ii) notify Providers of changes to ACH, address, and account information; (iii) pay all fees, fines, damages, losses, or expenses arising in connection with your possession or use of an Optional Service; (iv) perform your own due diligence before using an Optional Service; and/or (v) perform any other proper act related to your use of the Optional Service. You agree to indemnify and hold us harmless for any damage, loss, claim, or liability arising from your possession and/or use of any Optional Service. Each Provider has the right to require you to enter into a separate agreement with it. Whether you and Provider enter into a separate agreement, you agree that: (i) your rights and duties regarding the use of an Optional Service are neither assignable nor delegable without Provider's prior written consent; (ii) you acquire no property right, intellectual property right, claim, or interest in any of Provider's systems, equipment, software, processes, programs, or data; and (iii) you shall protect the confidentiality of Provider's software and documentation.

O. You agree to pay us all Provider-imposed fees and assessments in connection with your use of the Optional Service(s). Your obligation to pay us shall continue until: (i) you have notified Provider(s) of your intent to cancel the Optional Service(s); (ii) you have provided us with notice that (a) you have notified Provider of your intent to terminate, (b) you have returned all equipment and software to Provider, and (c) you have ceased receiving all Optional Services; and (iii) Provider no longer assesses us for your receipt of the Optional Services or for possession of the equipment or software. You waive all rights to contest, challenge, or withhold payment for any fees we assess for Optional Services until you have satisfied the conditions in the preceding sentence.

P. You authorize us to contact your customers or their Card issuing bank(s) to find out information about any Card transaction. You shall not contact a Discover Cardholder unless authorized to do so by the Operating Regulations or required by Law.

Q. **Bankruptcy**. You agree to execute and deliver to us any documents we request to perfect and confirm the lien, security interest, and setoff rights in this Agreement. You shall immediately notify us of any bankruptcy, receivership, insolvency or similar action or proceeding initiated by or against you or any of your principals. Further, you shall include us on the list of creditors filed with the Bankruptcy Court, even if no claim exists at the time of filing. This is an executory contract to make a loan or extend other debt financing or financial accommodations to or for your benefit and, as such, cannot be assumed or assigned in the event of your bankruptcy. This is a contract of recoupment and we are not required to file a motion for relief from the automatic stay to realize on any of the Secured Assets. Nevertheless, you agree not to contest a motion for relief from the automatic stay. You must adequately fund the Reserve Account to provide us with adequate protection under Bankruptcy Code § 362. We have the right to consume and offset against the Reserve Account to cover your obligations under this Agreement, regardless of whether they relate to transactions created before or after your bankruptcy filing. Because this Agreement contemplates the extension of credit for your benefit, you acknowledge that you cannot assign the contract in the event of a bankruptcy. We may immediately terminate the Agreement if you fail to comply with any part of this Section.

R. **Wireless Service Acknowledgement**. We are not responsible for verifying your wireless service coverage, or for losses in coverage, or for your failure to maintain coverage. By selecting wireless service, you acknowledge that wireless coverage is not guaranteed and we have no control over the wireless service providers or the decisions they make. Additionally, you acknowledge that if wireless service is lost in your area, the equipment will not operate with another wireless carrier. We are not liable if wireless coverage is lost in a specific area and the equipment can no longer be used as a wireless terminal.

S. **Virtual Terminal Processor Services and Fees.** Our Virtual Terminal Processor Service **(the "VT Service(s)")** is an additional service (subject to separate fees and charges). It allows you to effectuate Card transactions within the merchant portal application in accordance with our standards. You represent and warrant that you have implemented and will maintain secure systems for using the VT Services and transmitting information to us. You are responsible for any authorized or unauthorized transactions initiated using your user IDs. You assume all liability for (i) acts or omissions arising out of your use of the VT Services; and (ii) risks associated with using software with internet connectivity.

**6.    Fees and Other Services.**

A. You agree to pay fees, cost escalations, assessments, tariffs, penalties, fines, claims or other items under this Agreement or the Operating Regulations. We will periodically (daily, monthly, etc.) calculate your fees and charges and debit the account(s) that you designate **("Designated Account(s)")** to collect those amounts. We have the right to determine and change the periodic basis in the previous sentence in our sole discretion, without notice. We have the right to round, assess and calculate interchange and other fees and amounts in accordance with our standard operating procedures. We also have the right to assess some or all of the fees and charges via a separate or combined Services invoice(s). We will charge you for any fines, fees, penalties, loss allocations, assessments, registration expenses, certification expenses, telecommunication expenses, sponsorship fees and other amounts assessed by Member Bank and/or third parties or incurred as a result of your actions, omissions, or use of the Services, or those we incurred on your behalf under the Operating Regulations, the Rules Summary, and the Laws.

B. Transaction fees are fees charged on each authorization, Card draft, credit draft, or other transaction type, regardless of the stated total ("Transaction Fee(s)"). We may charge a Transaction Fee for any transaction activity.

C. VISA, MasterCard, and Discover Interchange fees, assessments, and other amounts will be either: (i) assessed to you separate from and in addition to the Discount Rate, Transaction Fee, and other fees listed in the Application, or (ii) included in the Discount Rate and/or Transaction Fee listed in the Application. For American Express Card transactions under Bundled Plus and Unbundled Transaction Pricing, we will assess interchange fees, assessments and other fees in addition to the Authorization Transaction Fee and other fees described on the Application. For American Express Card transactions under Tiered Transaction Pricing, interchange fees and other amounts will be included in the Discount Rate and/or Transaction Fee listed on the Application. For PIN debit Card transactions under Bundled Plus and Unbundled Transaction Pricing, we will assess interchange fees, sponsorship fees, switch fees, gateway fees, our Transaction Fee and other fees. For PIN debit Card transactions under Tiered Transaction Pricing, we will assess interchange fees, sponsorship fees, switch fees, and gateway fees as pass through, and other amounts will be included in the Discount Rate or Transaction Fee listed on the Application. Certain fees are available upon request or through the Associations. You are responsible for conducting your own inquiry into the nature and type of applicable fees. The Discount Rate, Transaction Fee and other fees may be based, in whole or in part, on interchange rates, assessments, and other fees that the Associations and Other Networks periodically change.

D. You acknowledge that in order to receive the best Discount Fee and Transaction Fee on a particular Card transaction, the transaction must first "qualify" and exactly meet certain criteria. Several factors can prevent a Card transaction from qualifying, including that it: (i) was hand entered (i.e., the encoded card information was not read by a point of sale device); (ii) was voice-authorized; (iii) was not authorized; (iv) was not transmitted for processing within 24 hours; (v) was a Consumer or Commercial Reward transaction, a Visa Signature transaction, or a MasterCard World Elite Card transaction; (vi) was deemed a "Non-Qualifying" transaction by the Operating Regulations (e.g., certain foreign transactions or transactions from business, commercial, purchasing, or government Cards); (vii) was difficult to capture; (viii) was difficult to authorize; (ix) was submitted incorrectly; or (x) was not eligible for the lowest electronic interchange fee for any other reason. Additionally, you might not qualify for the best Transaction Fee or Discount Rate if your average ticket differs from what we used to calculate the Transaction Fee and/or Discount Rate; if you submit more than five percent of your monthly Card drafts without electronic transmission; or if your terminal, software, or communications lines fail to function properly. The Associations change the transaction qualification criteria from time to time. For certain non-qualifying transactions, we assess a surcharge of a certain percent of the transaction amount. In the event that your Card transactions under Tiered Transaction Pricing do not qualify or only partially qualify for the qualified discount rate quoted on the Merchant Price Schedule and/or the Operating Regulations, you agree to pay the Mid-Qualified Discount Rate and/or Transaction Fee, or Non-Qualified discount Rate and/or Transaction Fee set forth on the Application. **In the event your Card transactions under the Bundled/Unbundled Transaction Pricing do not qualify or only partially qualify for the qualified discount rate quoted on the Merchant Price Schedule and/or the Operating Regulations, you agree to pay an additional Non-Qualified Surcharge if indicated on the Price Schedule.** We do not guarantee that your transactions will qualify for any given rate, and we disclaim all responsibility and liability for a transaction's failure to so qualify. In addition, Card transactions that do not meet the necessary criteria for payment are subject to complete denial, reversal and/or chargeback.

E. You shall pay all taxes imposed in connection with the Services. If we pay taxes for you, we can immediately debit your Designated Account or demand payment from you.

F. We may charge and you agree to pay for any non-specified service we provide and expense we incur at the request of or on behalf of you. Your use of any service not listed on the Application or provided at the commencement of the Agreement obligates you to pay any accompanying fees, charges, and related expenses. If you receive these Services you will be deemed to have consented to the fees, charges and expenses. We have no obligation to enhance or customize Services or additional services, but we may choose to do so for a separate fee. You shall take all necessary steps to ensure that you can receive the Services,

at your own cost. This includes procuring equipment and software, and taking other steps as we direct.

G. We reserve the right to charge you a reasonable fee if we reasonably believe you are not fully compliant with the Rules Summary, Operating Regulations, Payment Card Industry Data Security Standard ("PCI-DSS") or any Laws, or if you fail to prove compliance upon our request. This fee will be in addition to any other amounts payable under the Agreement.

H. After your initial conversion to us, you agree to pay all direct and indirect costs (including those we, our affiliates, or our agents incur) related to any conversion to or from us as applicable, and/or relating to any programming effort affecting the Services.

I. If we advance funds to you or delay your obligation to pay funds, we reserve the right to assess you a cost of funds in the manner and amount of our choosing.

J. Upon your request, we may transmit Banking Identification Number ("BIN") Files to you for a fee. We neither represent nor warrant the completeness or accuracy of the File. BIN File information is confidential and proprietary information of Visa and MasterCard and is subject to the confidentiality protections of this Agreement. You shall not use BIN File information for any reason other than to identify card type categories at the point of sale.

K. After we approve your Application, we will begin assessing any applicable monthly recurring charges. This Agreement subjects you to a Minimum Monthly Bill unless otherwise noted on the Application. In the event this Agreement expires or terminates for any reason, the Annual Fee or Semi-Annual Fee, as applicable, will not be prorated or refunded. If applicable, we may assess the ACH/DBA Fee listed on the Merchant Application for administrative services.

L. Under our Visa and MasterCard "Unbundled" pricing methodology, you pay the Transaction Fees in the pricing section of this Agreement if your "Average Ticket" (i.e., the net monthly Card sales divided by the difference between gross monthly line items, less monthly returns) is less than or equal to $150.00. If your Average Ticket in a month falls within the ranges described below, you shall pay the surcharge amounts listed below, in addition to the Transaction Fee:

| Average Ticket | Surcharge |
|---|---|
| $150.00 - $199.99 | $0.10/transaction |
| $200.00 - $499.99 | $0.25/transaction |
| $500.00 - $749.99 | $0.50/transaction |
| $750.00 or greater | $0.75/transaction |

M. We may offer one or more Select Packages. If we approve your participation in a Select Package, we will waive certain fees as stated in the Merchant Price Schedule. You must become and remain a party in good standing to an approved equipment lease (the "Third Party Lease Agreement") with an approved third party lessor in order to qualify for any special fees or waivers under the Merchant Price Schedule or this Section.

7. **Termination or Suspension of Services.**

A. **Default Event**. You are in default under this Agreement ("**Event of Default**") if: (i) we believe there has been a material or potentially material deterioration of your financial condition; (ii) you become subject to any voluntary or involuntary bankruptcy, insolvency, reorganization or liquidation proceeding, a receiver is appointed for you, or you make an assignment for the benefit of creditors, or admit your inability to pay your debts as they become due; (iii) you cease doing business as a going concern, or there is a change in the identity of any person or entity owning, directly or indirectly, ten or more percent of the business; (iv) you are in breach of any of the terms of the Agreement; (v) we reasonably believe fraud may be occurring, including splitting tickets or laundering tickets; (vi) your name or your principals' names are listed on the MATCH (Membership Alert to Control High Risk Merchants) System or other security or credit alert systems, or you are identified under an Association risk monitoring program; (vii) we determine that your Card transactions or the circumstances surrounding your Card transactions have become irregular or increase our exposure to chargebacks, reputational, or other security risks; (viii) we receive instructions from an Association or Other Network to close your account; (ix) circumstances exist that could cause harm or loss of goodwill to the Associations or Other Networks; (x) you no longer meet the eligibility requirements of an Association or Network; (xi) your volume in a calendar month exceeds 120% of the average annual volume indicated on the Merchant Application; (xii) your non-card present transactions in a calendar month exceed 120% of the MO/TO and internet volume on the Merchant Application; (xiii) you experience returns greater than three percent; (xiv) you cease doing the kind of business described in the Merchant Application; (xv) you fail to pay any amount to us when due; (xvi) in our opinion, provision of a Service might violate the Operating Regulations, Rules Summary, or the Laws; or (xvii) we believe that you have violated or are likely to violate the Operating Regulations, Rules Summary, or the Laws. We shall determine the existence of an Event of Default or Improper Transaction (defined in Section 7.A.). Our determination is conclusive unless you contest it in writing within one year. Upon the occurrence of an Event of Default, we may exercise any right or remedy in this Agreement without notice. These include: (i) terminating the Agreement; (ii) suspending or ceasing to provide the Services; (iii) collecting the early deconversion fee, if applicable; (iv) establishing a Reserve Account; (v) collecting any amounts you owe us by means of setoff, recoupment, or any other legal means; and/or (vi) assessing fees and recovering costs associated with the investigation of any suspected fraudulent activity or Event of Default. Termination for any reason shall not relieve you of any liability or obligation you owe us. We have a right to assess fees and recover all costs associated with our investigation of suspected fraudulent activity or an Event of Default. You agree that we may retain the entire amount of the Reserve Account as liquidated damages if you engage in an Improper Transaction. If you accept transactions in connection with an Event of Default, we have the right to hold settlement funds and to subject them to a per month fraudulent transaction fee equal to 15% of the amount held. We have no liability to you for any direct or indirect losses you may suffer as a result of our suspension of funds disbursement or failure to pay transactions in connection with an Event of Default.

B. **Early Deconversion Fee/Liquidated Damages.** If we terminate this Agreement after a breach by you, or if you wrongfully terminate the Agreement, you shall: (i) pay us the Early Deconversion Fee set forth on the Merchant Application for each "Merchant Chain"; and (ii) pay us liquidated damages equal to your average monthly fees for the three calendar months that your revenue was highest during the preceding 12 months (or shorter period if the Agreement has not been in effect for 12 months), multiplied by the number of months then remaining in the term of the Agreement. For clarity, the Early Deconversion Fee includes costs of processing Chargebacks, restocking equipment, and deleting numbers related to your deconversion. You agree that the liquidated damages are fair and reasonable because it is difficult or impossible to estimate our damages following a breach or wrongful termination. Additionally, you agree to pay us (i) any unpaid invoice; and (ii) any damages, losses, expenses, fees, fines, penalties, chargeback amounts, and adjustments we incur in connection with the Agreement. You authorize us to debit your Designated Account or to deduct amounts you owe us under this Section from the settlement funds we owe you. You are responsible for any collection fees, legal fees, and other expenses we incur in recovering your delinquent amounts.

C. **Return of Equipment/Materials**. You shall return our equipment, promotional materials, advertising displays, emblems, Card drafts, credit memoranda, and other forms within 14 days of termination. You agree to immediately pay any amounts you owe for equipment costs.

D. **Remedies Cumulative**. Our rights and remedies under this Agreement and/or at law or in equity are cumulative.

E. **Terminated Merchant File**. You acknowledge and consent to our obligation to report your business name and the name of your principals to the Associations if we terminate you due to the reasons listed in the Operating Regulations, including for breaching this Agreement. You agree to refrain from bringing any claims against us for reporting you to the Associations

F. Termination of this Agreement for any reason does not automatically terminate your equipment lease, if applicable.

G. If we believe that any of your activities, or our performance of any service under the Agreement, could subject us to increased regulatory scrutiny or reputational harm, we reserve the right to (i) terminate the Agreement at any time; or (ii) suspend or cease providing any service or the Services at any time.

8. **Authorization, Setoff, Reserve, and Security Interest.**

A. You authorize us, our agents, and third parties to initiate ACH credit/debit entries to or from the Designated Account, the Reserve Account, or any other account you maintain at any institution that is a receiving member of ACH, including for amounts you owe us, that we owe you, or for correction of errors. This authorization applies even after you change accounts. It survives the termination of this Agreement, until the later of: (i) two years from the Agreement's expiration; or (ii) the date you have satisfied all of your obligations to us. You shall ensure the Designated Account(s) have funds sufficient to satisfy your contingent and accrued obligations and duties under this Agreement. No attempt to change or alter the account (an "Account Change") is effective until we acknowledge the change on our system. Accordingly, you shall not close an old account until the new account receives the third deposit. We are not responsible for checking the accuracy of any Account Change your purported representatives submit in connection with an Account Change. Additionally, we are not responsible for liability associated with any Account Change unless it is due to our gross negligence or willful misconduct. You are solely liable for all fees and charges your financial institution assesses, including overdraft and NSF charges. You release and hold us harmless from any financial institution fees or charges, regardless of cause. We are not liable for any delays in receipt of funds or errors in debit and credit entries caused by unaffiliated third parties, including the Associations, Other Networks, a clearing house, or your financial institution. We may audit and verify all Card and credits you accept. You agree that we may debit or credit your Designated Account for any inaccuracies. You also agree to be bound by the National Automated Clearing House Association's operating rules.

B. You agree that payment is due the date we originate an ACH debit transaction record to your Designated Account. Fees not paid when due bear interest at the rate permitted by Law. You are responsible for paying all fees, without set-off or deduction. We have a right to set-off amounts you owe us from amounts we owe you or your affiliates.

C. The closing of your Designated Account does not constitute a mutually agreed upon termination of this Agreement.

D. As a specifically bargained for inducement for us to enter into this Agreement with you, we reserve the right at any time to: (i) create a reserve of funds ("Reserve Account") from settlement amounts or any other amount payable to you; (ii) require you to pay us the amount needed to fund a Reserve Account under this Agreement and/or pay any additional funds needed to maintain the Reserve Account at all times; and/or (iii) require you to establish an irrevocable standby letter of credit naming a beneficiary we designate ("Letter of Credit"). If we require security as described in the preceding sentence, you will immediately fund the Reserve Account or provide the Letter of Credit, and maintain the Reserve Account or renew or replace the Letter of Credit as we instruct. We have complete discretion to determine the amount of any Reserve Account or Letter of Credit. You will increase either at any time upon our request. If a Letter of Credit will be cancelled, will not be renewed, or will not be in full force and effect, you will provide a replacement Letter of Credit upon our demand, on or before the date that we determine Any Letter of Credit will be issued by a financial institution, in a format, and with an expiration date acceptable to us. We have the right to use the Reserve Account(s) and/or Letter(s) of Credit to cover amounts due or that might become due to us at any time. Reserve Account funds may be commingled with other funds, and need not be maintained in a separate account designated in your name. Subject to the other terms of this Agreement, we have the right and discretion to retain funds placed into the Reserve Account until you request the funds in writing, and the later of (i) 270 days has passed following the termination of this Agreement; or (ii) 180 days has passed since the last possible chargeback (the later date shall be the "Refund Request Date"). The Reserve Account becomes our property upon our notice to you if you engage in, or are suspected to have engaged in, (i) illegal business activities; (ii) collusive fraudulent transactions with Cardholders; (iii) laundering or aggregating illegal and/or brand damaging transactions; (iv) establishing your account with us through identity theft; or (v) any other fraudulent act. (each an "Improper Transaction"). You waive any contract right you have in the Reserve Account and its balances if you fail to object in writing within 90 days of the Refund Request Date or our notification of an Improper Transaction event.

E. We have the right to divert your funds to a Reserve Account or to temporarily suspend processing for a reasonable time to investigate any real or potentially improper transaction activity. Following an investigation, we may continue to maintain the diverted funds in a Reserve Account in accordance with this Section 8. We have no liability to you for diverting funds or suspending processing.

F. This Agreement is a security agreement under the Uniform Commercial Code. You grant us a security interest in and lien upon all: (i) funds in the Designated Account; (ii) funds in the Reserve Account; (iii) amounts due you under this Agreement, including rights to receive payments or credits; and (iv) proceeds in any account or from any sale (collectively, the

"**Secured Assets**"), to secure all of your obligations under this Agreement. For Secured Assets maintained by Member Bank, you authorize Member Bank to comply with our demands regarding the Secured Assets. Our control of the Secured Assets with Member Bank constitutes a perfected interest under Article 9 of the Uniform Commercial Code. We may direct the disposition of the Secured Assets without further consent from you. You represent and warrant that we have the only security interest in the Secured Assets. You agree not to grant a security interest in the Secured Assets to a third party without our prior written consent. Additionally, we have a contractual right of set-off against the Secured Assets. Our right of set-off shall be deemed to have been exercised immediately upon the occurrence of an Event of Default without any action by us or notation in our records, even if we enter the set-off on our books and records at a later time.

**9.  Indemnification and Limitation of Liability.**

A.  You shall indemnify and hold us, and our directors, officers, employees, affiliates, and agents harmless from and against all proceedings, claims, demands, losses, liabilities, damages and expenses (including any fines, fees, assessments, audit fees, card replacement costs, or penalties levied against us by an Association, any Card issuer, or any Other Network, and attorneys' and collection fees and expenses) resulting from or otherwise arising out of: (i) the Services; (ii) any breach of any term or condition of this Agreement; (iii) any misrepresentation by you under this Agreement; (iv) your acts or omissions in connection with the Services under this Agreement, including the acts and omissions of your employees and agents; (v) your processing activities and provision of goods and services to Cardholders; (vi) any violation of the Operating Regulations, the Rules Summary, or the Laws; (vii) any guarantees we provide to a third party for your benefit, including lease guarantees; (viii) any infiltration, hack, breach, or violation of the processing system resulting from, arising out of, or in any way related to your ability to use the Services, including your use of an Agent or any other third party processor or system, or your ability to connect to the Internet or an external network; (ix) any act or omission of a third-party with which you have contracted; (x) any bankruptcy proceeding; (xi) effecting transactions with the use of a lost, stolen, counterfeit, or misused Card; (xii) any action you institute against any Association, Other Network or Card issuer following a chargeback or fine; or (xiii) any action we take against the Designated Account, Reserve Account, or any other account you own, pursuant to this Agreement. You shall also defend, indemnify, and hold harmless the institution that maintains your Designated Account for acting in accordance with any instruction from us regarding the Designated Account. This indemnification shall survive the termination of the Agreement. Your enrollment in the Breach Assist Program only reduces your indemnification obligations under this Agreement by the amount we actually recover in connection with the Breach Assist Program, and only to the extent the recovered amounts specifically relate to a data breach solely involving you. The Breach Assist Program's limited indemnity waiver may not cover all the costs associated with a data breach. You may review the specific terms and conditions of the Breach Assist Program at www.royalgroupservices.com/breach-assist/, or by contacting a customer service representative at 1-800-393-1345 or 1-877-207-6727.

B.  EXCEPT FOR THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, WE DISCLAIM ALL WARRANTIES, INCLUDING ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. You acknowledge and assume all risks associated with the acceptance of cards. We are not liable for lost profits, lost business, or any incidental, special, consequential, or punitive damages (whether or not arising out of circumstances known or foreseeable by us) you or your customers or any third party suffers in connection with the Services. We are not liable for damages or losses wholly or partially caused by you or your employees or agents. Nor are we liable for any damages or losses you may sustain as a result of our exercise of post-default rights or remedies under this Agreement, provided we had a good-faith, reasonable basis to believe an Event of Default occurred. Our liability related to or arising out of this Agreement shall not exceed the fees paid to us for the particular Services in question for the calendar month preceding the date of our relevant act or omission. The parties acknowledge that the limitations in this Section are integral to the amount of fees we charge for the Services. Except as otherwise described in this Section, your exclusive remedy for any claim against us is termination of the Agreement. We are not in default under this Agreement or liable for any delay or loss in the performance, failure to perform, or interruption of any Services resulting, directly or indirectly, from errors in data you or other parties provide to us, or any event beyond our reasonable control, including the Force Majeure Events defined below. If we defend a claim you bring against us and prevail, you shall reimburse us the costs, attorneys' fees, and other related expenses we incurred.

C.  We are not liable for, nor in default under this Agreement, for any delays, failure to perform, loss of performance, or interruption in service resulting directly or indirectly from a Force Majeure Event. A "Force Majeure Event" includes labor disputes; fire; weather; acts of God; acts of a public enemy; other casualty; power outages; funding delays (however caused); governmental orders or regulations; errors in data provided by you or others; international, domestic, and/or economic terrorism; or any other cause, whether similar or dissimilar to those just mentioned, beyond our reasonable control.

D.  Except for actions related to your failure to pay amounts due under the Agreement, no cause of action shall be brought by either party more than one year after it accrued.

E.  You recognize and agree that any limitations of liability set forth in this Agreement are fair and reasonable.

**10.  Confidentiality.**

A.  We will be providing you with Confidential Information. "**Confidential Information**" includes this Agreement and information relating to our methods, techniques, programs, devices and operations and those of Providers, the Associations, and Other Networks. You shall not disclose Confidential Information to any person or entity, other than to your employees and agents who participate directly in the performance of this Agreement and need access to the information. You agree to comply with the confidentiality and security requirements of the Rules Summary, the Laws, and the Operating Regulations. This includes the Visa Cardholder Information Security Program **("CISP")** found at www.visa.com/cisp; the MasterCard Site Data Protection Program ("**SDP**"), found at www.mastercard.com/sdp; and the American Express Data Security Operating Policy ("**DSOP**"), found at www.americanexpress.com/merchant; and any similar Association or Other Network program requirement. You acknowledge receipt of our notice of privacy policies and practices ("**Privacy Notice**"). Notwithstanding anything to the contrary in the Privacy Notice or this Agreement, we have the right to use, disclose, share, and retain any information you provide or that arises out of the Services, during the term and thereafter: (i) with your franchisor or franchisee(s), association(s) you belong to or belonged to at the commencement of this Agreement; (ii) with your affiliates; (iii) in response to subpoenas, warrants, court orders or other legal processes; (iv) in response to requests from law enforcement agencies or government entities; (v) to comply with applicable Laws; (vi) with our affiliates, business partners and agents; (vii) to Associations and Other Networks and their designees, (viii) to Providers and their designees; (ix) to any other referral source or processor, including the applicable referrer, ISO/MSP, or independent Card office; (x) to perform analytic services for you, us and/or others, including analyzing, tracking, and comparing transaction and other data to develop and provide insights for those parties as well as for developing, marketing, maintaining and/or improving our products and services; and/or (xi) to offer or provide the Services under this Agreement. You authorize us to (i) make public the execution of this Agreement and/or the provision of Services under this Agreement; and (ii) include your name and logo on a list of our customers that may be shared with the public. Upon our request, you agree to provide testimonial information regarding the Services.

B.  You must secure and prevent the unauthorized access of any systems and media containing account, Cardholder, or transaction information (physical or electronic, including account numbers, Card imprints, and terminal identification numbers). Except for Card drafts you maintain in accordance with this Agreement or the Laws or Operating Regulations, you shall render inoperative and unreadable any media you no longer deem necessary or appropriate to store. You shall notify us of the identity of any third party who will have access to Cardholder data ("Merchant Provider(s)"). You shall also ensure that (i) Merchant Providers cannot access Cardholder data unless authorized by the Operating Regulations; (ii) Merchant Providers have proper security measures to protect Cardholder data; (iii) you and Merchant Providers comply with the PCI DSS; and (iv) you have written agreements with Merchant Providers requiring compliance with the terms of this Section. You shall immediately notify us of any suspected or confirmed loss or theft of any transaction information. This includes any loss or theft from a Merchant Provider. You are responsible for demonstrating your and Merchant Providers' compliance with the PCI DSS programs. You agree to provide us reasonable access to your locations and the locations of your Merchant Providers so that we can, at our option, verify whether you and your Merchant Providers can prevent future security violations. In the event of a suspected or confirmed loss or theft of information, you agree, at your expense, to provide any information, whether requested by us, an Association, financial institutions, or a local, state, or federal official in connection with the event. You further agree to cooperate in any ensuing investigation, including any forensic investigation. The information you provide in response to an investigation shall be considered our confidential information. The requirements of this provision apply to Cardholder data regardless of the medium in which the information is contained and regardless of whether you process transactions via internet, mail, phone, face-to-face or any other method.

C.  Our proprietary and confidential online portal service provides reporting detail about your use of the Services ("Portal Services"). We reserve the right to disallow, discontinue, suspend, or change your use of Portal Services at any time without notice. You agree to maintain the confidentiality of any Portal Services passwords in your possession. If we provide Portal Services to you, our only obligation is to make the Portal Services available in accordance with our standard operating procedures (e.g., then-current timeframes, standards, scheduling, and procedures, including those for setup, account access, and suspension of Portal Services). You shall provide us with prompt written notice of account or user ID changes, including User IDs that are no longer active or should be deleted. You are solely responsible for any unauthorized access to Portal Services, including unauthorized employee or agent access, or third party access. We have no liability for third-party interruptions in Portal Services (e.g., internet providers), or errors or inaccuracies in the data reported to you.

**11.  Continuing Unlimited Guaranty.** This Section ("Continuing Unlimited Guaranty") applies to each person who signs this Agreement as a Guarantor (each a "Guarantor"). To induce us to enter the Agreement, each Guarantor jointly and severally guarantees the prompt and full payment of all Obligations (defined below) when due.

A.  The word "Obligation" is used in its most comprehensive sense. It includes all indebtedness, debts and liabilities (including principal, interest, late charges, collection costs, attorneys' fees and the like) that Merchant owes us, whether Merchant created the obligation alone or with others, and whether Merchant is primarily or secondarily responsible. Obligations can be secured or unsecured, absolute or contingent, liquidated or unliquidated, and direct or indirect. Obligations can be evidenced by note, draft, a guaranty agreement, or otherwise. Obligations can exist now or arise in the future. It includes all payment obligations, indemnification obligations, and indebtedness Merchant owes us arising from or related to the transactions or Services under this Agreement.

B.  Guarantor promises to pay any Obligation that Merchant has not promptly paid when due. Guarantor promises to pay irrespective of our actions or inactions regarding the Obligations, or whether we have enforced any security interest created under this Agreement. Guarantor further promises to pay irrespective of the invalidity, insufficiency, or unenforceability of any Obligation. Guarantor's obligations shall not be affected, modified or impaired by any counterclaim, set-off, deduction or defense based upon any claim the Guarantor may have against you (Merchant) or us, except payment or performance of the Obligations.

C.  Guarantor waives notice of any acceptances of this Continuing Unlimited Guaranty. Guarantor waives presentment, demand, protest, notice of protest, and notice of dishonor or other nonpayment of any Obligations. Further, Guarantor waives notice of sale or other disposition of any collateral or security we now hold or later acquire. The duties of Guarantor shall not be released, discharged, or modified by: (i) our extending the time for payment (for Merchant or Guarantor); or (ii) our delay or omissions in exercising any rights, taking any actions, or pursuing any remedies against Merchant or Guarantor. Guarantor agrees that we may release or modify any collateral, security, or other guaranties without notice or consent from Guarantor and without modifying Guarantor's duties to us. This is a guaranty of payment and not of collection. We have no obligation to demand or pursue any rights against Merchant, anyone else (including another Guarantor), or to exhaust any rights or remedies related to any collateral, security, or other guaranties before demanding payment from Guarantor. Guarantor waives all defenses based on suretyship or impairment of collateral. Following a default under this Agreement, we may apply and/or setoff against amounts due to us any deposits, account balances, or other credits of Guarantor in our possession. Guarantor grants us a security interest in the items just described.

D. The obligations of any Guarantor shall be joint and several with Merchant and any other Guarantor under this Agreement. The property described in any collateral security documents Guarantor provides, whether previously, contemporaneously, or in the future, secures this Continuing Unlimited Guaranty. This Continuing Unlimited Guaranty shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, transferees and assignees. Other terms and conditions applicable to this Continuing Unlimited Guaranty can be found in Section 12.L.

**12. Miscellaneous Terms and Conditions.** The following terms and conditions also apply.

A. **Title to the Services.** You agree that the Services are licensed and not sold. As a result, you only acquire a nontransferable, revocable, non-exclusive right to use the Services. The right exists only during the term of the Agreement, and only for the purpose of accepting and managing payments. We retain all right(s), title, and interest in and to the Services. This includes rights in materials we deliver to you, and any invention, development, product, trade name, trademark, service mark, software program, or derivative from any item just listed. You shall not: (i) copy, reproduce, alter, modify, create derivative works, publicly display, republish, upload, post, transmit, resell, or distribute any of our material; (ii) permit any third party to use or benefit from the Services through a rental, lease, timesharing, service bureau, or other arrangement; (iii) work around, bypass or circumvent any of the technical limitations of the Services, use any tool to enable disabled functionalities, or decompile, disassemble, or reverse engineer the Services (unless the restriction is prohibited by the Laws); (iv) perform any act that interferes with proper access or use of the Services; or (v) use the Services in any manner not expressly allowed under this Agreement.

B. **Notices.** Unless otherwise stated, you shall deliver notices and other communications in writing via certified mail or reputable overnight courier (postage prepaid) to the following address: Worldpay, LLC, Attention: General Counsel/Legal Department, 8500 Governors Hill Drive, MD# 1GH1Y1, Symmes Township, OH 45249-1384. Notices delivered in this manner become effective upon our actual receipt. Our communications to you shall be delivered via email, facsimile (effective upon transmission confirmation), ordinary or certified mail (effective the seventh day after mailing), reputable overnight courier (effective the first day after submission to the courier), or via a report, communication via Portal Service or invoice (effective when made available).

C. We have no obligation to process any Visa or MasterCard transaction beyond the authority of a U.S. member of Visa and MasterCard or any Discover Network Card or American Express transaction outside the United States and other United States territories.

D. **Account Debiting Authorization.** In addition to our other collection rights in this Agreement, you expressly authorize us or our affiliate to collect amounts due us or our affiliate by debiting any deposit account you maintain with Member Bank.

E. **Amendments.** We may amend this Agreement or change rates at any time. You do not have the same right. We will provide notice of changes in accordance with the notice Section of this Agreement. If you continue to process transactions after, or fail to notify us that you contest a change within seven days of actual or constructive notice, you will be deemed to have accepted that change. We have the right to make Association and Other Network changes and increases in interchange, fees, or assessments without providing you notice. You agree to pay these increased fees and charges throughout the term. We are not bound by any changes, additions, or deletions you make to the Agreement unless they are part of a written amendment that is signed by you and us.

F. **Assignment.** We have a right to assign this Agreement. Unless you get our prior written consent, you do not. This means that any assignment, even an assignment by operation of law, is prohibited without our consent. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, transferees, and assignees (if applicable). If you assign this Agreement without our consent, the assignee will be bound by the terms of this Agreement. Your sale of the business does not relieve the original owner or original Guarantors of chargeback or other liabilities, even those occurring after sale.

G. **Independent Contractors.** We are not your agent, and we are not in a joint venture, or partnership with you (or vice-versa). Both you and we are independent contractors.

H. **No Third-Party Beneficiary.** Unless expressly stated in these Terms and Conditions, this Agreement is for the benefit of, and may be enforced by, only you and us, and our successors and permitted transferees and assigns. It is not for the benefit of any third party.

I. **Employee and Agent Actions.** You are responsible for the acts or omissions of your employees and agents related to this Agreement and the use of the Services.

J. **Severability and Non-Waiver.** The invalidity or illegality of any part of this Agreement shall not invalidate the rest of the Agreement. The Agreement shall instead be construed as if the invalid or illegal provision were not part of the Agreement. Our delay or failure to exercise any right under this Agreement shall not operate as a waiver or estoppel of that right.

K. **Signature.** An original, a copy, facsimile copy, or digital, photographic or electronic copy of your signature serves as the signature for this Agreement. Further, duplicate original records of this Agreement (digital, photographic, or otherwise) have the same force and effect as the original. The parties agree that contracting through electronic means including e-signature or "click to agree" processes is an acceptable form of showing agreement.

L. **Arbitration, Governing Law, Jury Waiver, and Class Action Waiver.** This Section applies to you, any Guarantor, or any other party who claims an interest in this Agreement.

   i. **Arbitration.** The parties agree to submit any unresolved dispute, controversy, or claim between them to binding arbitration in lieu of litigation or other court or administrative proceedings. ANY ARBITRATION UNDER THIS AGREEMENT WILL ONLY BE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS, CLASS ACTIONS, PRIVATE ATTORNEY GENERAL ACTIONS, AND CONSOLIDATION WITH OTHER ARBITRATIONS ARE NOT PERMITTED. The Federal Arbitration Act governs the interpretation and enforcement of the arbitration provisions in this Section. It also governs any arbitration proceedings that take place pursuant to this Section. The parties shall make arbitration filings in Cincinnati, Ohio or Hamilton County, Ohio. Filings must comply with the Commercial Arbitration Rules of the American Arbitration Association. The parties shall share the costs, fees, and expenses of the arbitration and the arbitrators equally. The arbitrator's award, including awards of attorney's fees, costs, and expenses, shall bind the parties and may be entered as a judgment in any court of competent jurisdiction. The statute of limitations is a defense to the commencement of an arbitration proceeding. However, the filing of an arbitration proceeding tolls the statute of limitations. Nothing in this Section prohibits a party from applying to a court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other equitable relief.

   ii. **Governing Law.** The parties have entered into this Agreement in Ohio. The laws of Ohio govern the interpretation, construction, and enforcement of this Agreement, including the Continuing Unlimited Guaranty. Without waiving our right to enforce the Arbitration provisions in this Section, you/Guarantor agree only to bring a legal suit, action, or proceeding arising out of or related to this Agreement or pertaining in any way to the relationship between us and you, or us and Guarantor (an "Applicable Claim"), in a state or federal court in Hamilton County, Ohio. With respect to any Applicable Claim brought by us, you or Guarantor, you/Guarantor waive any objection to venue, and submit to the jurisdiction of a state or federal court in Hamilton County, Ohio. Nothing in this Section prohibits us from bringing any action or from exercising our rights under this Agreement in another state or country. You/Guarantor agree that our service of a Summons and Complaint at the address listed in the Agreement constitutes proper service and subjects you/Guarantor to the personal jurisdiction of the respective court. Unless the Operating Regulations require otherwise, you shall bring any claim you have against Member Bank against us (subject to the limitations and restrictions of the Agreement), and not against Member Bank.

   iii. **Jury Waiver.** YOU AND/OR GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS TO HAVE A CASE DECIDED BY A JURY. YOU AND/OR GUARANTOR AGREE THAT OUR FILING OF A COPY OF THIS PARAGRAPH IN ANY PROCEEDING CONCLUSIVELY PROVES YOUR WAIVER.

   iv. **Class Action Waiver.** YOU AND/OR GUARANTOR ALSO WAIVE ANY RIGHT TO PARTICIPATE IN A CLASS ACTION AGAINST US OR MEMBER BANK.

M. **Headings and Construction.** The parties have used the headings in this Agreement for convenience only. No heading shall affect the interpretation of any provision. These Terms and Conditions are subordinate to the Rules Summary, the Operating Regulations, and the Application (unless the Application is blank). Our approval of the Application does not guarantee you a right to receive processing. The parties have chosen the language in this Agreement to express their mutual intent. No rule of strict construction shall operate against any party. This Agreement constitutes the entire agreement between the parties with regard to the Services, and supersedes all prior or other agreements or representations regarding the Services, whether written or oral. All prior understandings have merged into this Agreement.

N. **Other Rights and Acknowledgements.** We may change Member Banks at any time without notifying you. Any Member Bank may delegate all or part of its duties to its affiliate at any time, also without notifying you. We are an agent of Member Bank in connection with Visa and MasterCard transactions, and may use an ISO/MSP in connection with this Agreement. The ISO/MSP is an independent contractor and not our agent. Accordingly, ISO has no authority to execute an Agreement on our or Member Bank's behalf. You owe Member Bank the same obligations you owe us. We may exercise any rights or remedies in this Agreement individually or jointly with Member Bank, and may likewise exchange or allocate the duties and obligations each owes to you.

O. **Attorney's Fees.** You shall reimburse and indemnify us for all attorneys' fees and other costs and expenses we incur or pay in: (i) defending our rights under this Agreement; (ii) enforcing the Agreement; or (iii) collecting any amounts you owe us under the Agreement.

P. **Survival.** Provisions that impose or could impose a continuing obligation on you shall survive the expiration and termination (for any reason) of this Agreement. This includes your liability for chargebacks and reversals, your duty to indemnify us and Member Bank, and your duties with respect to account maintenance.

Q. **Association/Other Network Agreements.** You may sign an agreement with an Association or Other Network ("Other Merchant Agreement"). An Other Merchant Agreement is a separate and independent agreement. We have no responsibility for Association's, Other Network's, or your breach of an Other Merchant Agreement. We do not have to comply with the terms or conditions of an Other Merchant Agreement. We have a right to cease providing Services for any Other Networks or Associations in our sole discretion. You agree to pay all fees, fines, assessments and penalties the Associations or Other Networks impose. We may allocate those fees, fines, assessments, or penalties in any manner and in our sole discretion. You agree that all POS terminals operate with unique keys according to PIN debit network requirements.

R. **Routing.** You authorize us to decide where to route a Card transaction.

S. If applicable, we and you shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their color, race, religion, sex, or national origin. Moreover, these regulations, if applicable, require each of us to take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

**13. Representations and Warranties.** You represent and warrant that:

A. **Information.** Any information you have submitted is true, complete, and accurate. This includes information about your entity type, the nature of your business (e.g., products and services sold, manner of sale, etc.), and the financial condition and ownership and executive structure of your business.

B. **Corporate Power.** You and the person signing this Agreement on your behalf have the power to execute this Agreement and to perform under this Agreement. The person signing this Agreement may execute any future documents and take any future action on your behalf.

C. **Existence/Organization.** You are a person or an entity validly existing and organized in the United States.

D. **No Litigation.** You have no knowledge of an actual or threatened action, suit, or proceeding against you that might impair your financial condition or prevent you from operating your business as you now conduct it. You have never appeared on MasterCard's MATCH system or the Combined Terminated Merchant File, except as already disclosed in writing.

E. **Transactions.** The Card Transactions you submit to us: (i) represent the obligations of the authorized Cardholder for merchandise or services actually sold, rented, or rendered (except for any delayed delivery or advance deposit authorized by the Operating Regulations)

and must not involve any element of credit for any other purpose; (ii) represent *bona fide* Card/rentals of merchandise and/or services not previously submitted and do not represent a refinancing of any prior obligation; (iii) are not subject to any dispute, setoff, or counterclaim against the price; (iv) are not, to your knowledge or notice, fraudulent, not authorized by the Cardholder, or subject to any other infirmity or impairment; and (v) do not result from any sale outside your normal course of business, as described in the Application.

F. **Products and Services**. The following items are true: (i) you have complete power and authority to sell the products and services you offer and to display the advertisements you use; (ii) your products and services are not illegal, and you will not accept a Card for any illegal transaction; (iii) you will prominently and unequivocally inform each Cardholder of your identity at all points of interaction during the transaction to distinguish you from any other party; (iv) your products, services, and business name do not infringe upon the rights of any other person, including trademark, copyright, confidentiality or patent rights; and (v) you will not sell, market, or display any products or services that would jeopardize our reputation.

G. **PIN Debit & EBT Card Processing Services; Availability of Terminals**. We will process PIN debit Card transactions for you if indicated in the Application or an amendment. If you accept EBT Cards, the terms in Addendum A shall apply. We will provide sponsorship services to you (through a third party bank), if applicable. You will take all steps necessary to ensure that point-of-sale devices and PIN pads will be available for Cardholder use and will function in a reliable manner.

14. **Equipment Program.** The following provisions apply to if you elect to purchase supplies or purchase or rent equipment from us at any time:

A. **Provision of Equipment.** You acknowledge receipt of the equipment listed on the Initial Equipment Order Information and Pricing section of the Application. Our then-current standard pricing applies to the equipment. You agree to pay our then-current standard price (plus shipping) for any additional equipment or supplies.

B. **Purchase**. You are solely responsible for maintaining and repairing the equipment you purchase from us. We make no representations or warranties about the condition of the equipment, including any express or implied warranties of merchantability or fitness for a particular purpose. You agree to accept the equipment "AS IS," and to release us from any liability related to the equipment.

C. **Rental Term**. Unless purchase code "S," "L," or "O" appears in the Initial Equipment Order Information and Pricing section of the Application, each individual piece of equipment ("Rental Equipment") shall have a separate rental term. The term of each piece of Rental Equipment begins on its order date. It continues on a month-to-month basis. Any property interest in the Rental Equipment belongs solely to us (or our delegates or assigns). Either party may terminate the rental term for a piece of Rental Equipment on 30 days prior written notice. On the effective date of a termination, we may debit an amount equal to the fair market value of the Rental Equipment from your Designated Account. If you return the Rental Equipment within ten days of termination, we will refund the debited amount (less our determination of diminished value and/or cost of repairs). Call 844-249-9869 for a tag number and address for returning the Rental Equipment. You bear all return costs.

D. **Equipment Swap Program**. Our equipment swap program applies only to stand-alone PIN Pads and check readers, and terminals we support and integrate with PIN Pads or check readers. If you use the program, we, or our designated equipment provider ("Equipment Provider"), will provide you with programmed terminal(s), PIN Pads or check readers (the "Replacement Equipment"). When you receive the Replacement Equipment, you shall mail, in accordance with any instructions, the Equipment Provider a corresponding number of used equipment of the same brand and model, in good working condition ("Merchant Equipment"). The Merchant Equipment becomes the property of Equipment Provider when it receives the equipment. If Equipment Provider does not actually receive the Merchant Equipment within 30 days off the date Equipment Provider shipped the Replacement Equipment to you, we will charge you our standard purchase price for the Replacement Equipment. The Replacement Equipment shall become your property only after we receive payment from you and Equipment Provider receives the Merchant Equipment from you.

E. **Equipment Re-injection Services**. We may offer equipment reinjection services for stand-alone PIN Pads and check readers, and for terminals we support and integrate with PIN Pads or check readers. To use this service, you must mail your equipment (in good working condition) to Equipment Provider via insured shipment. Equipment Provider will re-inject the Merchant Equipment and return it to you.

F. We reserve the right to charge you shipping and handling fees for any equipment deliveries under the Agreement.

G. You agree that you will only permit employees who have read the operating instructions that we provided to operate the equipment. You also agree not to remove any equipment from its original place of installation without our prior consent. Neither you nor your employees may make modifications or additions to the equipment. Additionally, you shall only use the equipment in accordance with this Agreement. You shall not use the equipment for credit inquiry or account verification.

H. We have the right, but not the obligation, to enter your premises to service equipment, and to confirm the existence, condition, and proper maintenance of the equipment. We shall exercise this right during reasonable business hours. You agree to surrender the equipment to our authorized representative on our demand.

I. **Malfunctioning Equipment shall be shipped to Processor**. If your equipment malfunctions, call 844-249-9869 for instructions from us. For equipment we have agreed to maintain, we will either repair the equipment or send you comparable equipment. For equipment we have not agreed to maintain, you are responsible for all equipment-related expenses. These include maintenance and replacement expenses. You agree to promptly notify us at our designated terminal help desk telephone number of any malfunction or other incident resulting in the loss of use of the equipment.

J. You agree to pay all equipment related fees, expenses, and costs. You also agree to review all reports and/or invoices we prepare or our agents prepare. Your failure to reject any report or invoice within five business days constitutes an acceptance of its content.

K. You are solely responsible for complying with the Operating Regulations and Laws regarding your use of the Equipment.

15. **Gift Card Program.** The following provisions apply if you elect to receive gift card program processing services and/or related services ("Gift Card Services"):

A. **Compliance with Laws.** You are solely responsible for complying with the Laws related to the Gift Card Services. Upon our request, you shall periodically provide us with a written certification indicating your compliance with the Laws. We have the right to suspend or terminate the Gift Card Services if you fail to provide a certification. We make no representations or warranties about any sample materials we may provide to you. You use our sample materials at your own risk. Using our sample materials does not relieve you from any obligations you have under the Agreement.

B. **Merchant Gift Card Responsibilities.** You are responsible for gift card issuance, acceptance, and unused funds, and for the preparation and content of the gift cards, and of the cardholder agreements and disclosures. You assume all responsibility for funding the gift cards. You are responsible for the accuracy and security of all gift cards and gift card transactions. You are also solely liable for any losses arising out of or related to fraudulent gift cards or gift card transactions, and for anything arising out of your and your gift card cardholders' participation in the gift card Services.

C. **Cardholder Authorization Limits.** You shall set and maintain cardholder authorization limits in accordance with the Laws and this Agreement. You shall notify us of the limits and any other terms and conditions applicable to your use of the Gift Cards.

D. **Gift Card Affiliates.** If we decide to provide Gift Card Services to your eligible affiliates and/or franchisees ("Gift Card Affiliates") at your request, you agree to ensure the compliance of your Gift Card Affiliates with this Agreement. You agree to guarantee full and unconditional responsibility for the performance of any obligations of each Gift Card Affiliate related to this or any agreement between us and the Gift Card Affiliate(s). You agree to accept full responsibility for resolving any issues arising out of the Gift Card Services between you and any Gift Card Affiliate. Upon request, you agree to cause each Gift Card Affiliate to execute our standard addendum for Gift Card Services.

E. **Trademarks.** You are responsible for all content appearing on the Gift Cards. You represent and warrant that you have all rights and permissions necessary to use the content on the Gift Cards. You shall immediately notify us if a third party claims the Gift Card content infringes against its rights. You agree to indemnify and hold us harmless from any and all claims against us and any resulting liabilities, costs and expenses arising out of the content of the Gift Cards. This section shall survive termination of this Agreement. You agree that we may use your name, logo, trademarks, etc., in materials related to the Gift Card Services or in our own advertising.

16. **Special Association Considerations.** There are a few special rules regarding your participation in the Discover or American Express Card programs.

A. **Discover.** We have no liability for not processing or settling a retained Discover merchant's Discover Cards (as defined by Discover).

B. **American Express.** The following terms apply only to your American Express Program (see the American Express merchant requirements for capitalized terms).
  i. You authorize us to exchange transaction and settlement information with American Express on your behalf.
  ii. You agree to comply with the American Express Program terms provided in the Rules Summary, and the American Express Merchant Operating Guide, which can be located at http://www.americanexpress.com/merchantopguide and is incorporated herein by reference.
  iii. We may disclose Transaction Data, Merchant Data, and other information about you to American Express. American Express may use the disclosed information for any lawful business purpose.
  iv. In the event your Charge Volume exceeds (1) $1,000,000 in a rolling twelve month period, or (2) $1,000,000 in any three consecutive months ("High CV Merchant"), American Express may convert you to a direct Card acceptance relationship. Upon conversion, you will be bound by American Express' then-current Card Acceptance Agreement and corresponding pricing and fees.
  v. You shall only sell *bona fide* goods and services at your establishment(s). Your Card transactions shall be free of liens, claims, and encumbrances, other than ordinary Card tax. Additionally, you shall not assign any payments you are due under the Agreement to a third party. However, you may sell and assign future transaction receivables to us or our affiliated entities and/or any other cash advance funding source we (or our affiliates) partner with.
  vi. This Agreement confers third party beneficiary rights in American Express for enforcing terms against you. It imposes no obligations on American Express.
  vii. You may opt out of accepting American Express Cards in writing without affecting your rights to accept other payment products.
  viii. We may terminate your right to accept American Express Cards if: (i) you breach the Agreement; (ii) American Express instructs us to do so; or (iii) you engage in fraudulent or any other activity justifying termination.
  ix. You may not bill or collect from any American Express cardholder for any purchase or payment on the Card unless chargeback has been exercised, you have fully paid for the charge, and you otherwise have the right to do so.
  x. You agree to remove any American Express Licensed Marks from your website or any other location when your participation in the Program ends.
  xi. If you do not participate in the American Express Program or EA Program, we will have no liability for not processing or settling your American Express transactions. Further, American Express cards will not be included in the definition of Cards.

17. **Key Definitions.** The following definitions are especially important:

A. **"Agreement"** means the Merchant Processing Agreement (including these Terms and Conditions), the Application, Rules Summary, Operating Regulations, and any attached addenda, exhibits, schedules, or other documents.

B. **"Associations"** means, collectively, MasterCard International Inc. ("**MasterCard**"), VISA U.S.A., Inc. ("**VISA**"), DFS Services LLC d/b/a Discover Network ("**Discover**") (including any card issuer of payment cards processed and settled through the Discover network, which may include Japanese Credit Bureau ("**JCB**"), China Union Pay ("**CUP**") and Diners Club International ("**DCI**"), and American Express Travel Related Services Company, Inc. ("**American Express**") and certain similar entities.

C. **"Application"** means either the physical/virtual form or the act of making application to Worldpay by providing information via a web page user interface.

D. **"Cards"** means Association or Other Network branded cards that enable consumers to purchase goods and services from Merchants.

E. **"Cardholder(s)":** persons authorized to use Association or Network branded cards.

  F. **"Effective Date"** means the later of (i) the date you signed the Application, or (ii) the date we approved the Application.
  G. **"ISO/MSP"** means an independent Card organization/member service provider operating under the Operating Regulations.
  H. **"Laws"** means all applicable state, federal, and local laws, rules, and regulations.
  I. "**Member Bank**" means a member of VISA®, MasterCard® and/or Other Networks, as applicable, that provides sponsorship services in connection with this Agreement.
  J. **"Operating Regulations"** means the Association and Network bylaws, operating regulations, rules, policies and procedures. The Operating Regulations may be changed or updated from time to time without notice.
  K. **"Other Networks" or "Networks"** means, collectively, all Processor supported networks not defined above as Associations.
  L. **"Rules Summary"** means the document containing a summary of key Operating Regulations governing this Agreement as amended from time to time.
  M. **"Service"** means any services described in this Agreement and/or provided by us.

# EXHIBIT 2

## Proposed Form of Order

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Van's Aircraft, Inc.,<br><br>           Debtor. | Case No. 23-62260-dwh11<br><br>**ORDER GRANTING DEBTOR'S AND WORLDPAY, LLC'S JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN** |

THIS MATTER having come before the Court upon Debtor's and Worldpay, LLC's ("Worldpay") Joint Motion for Order Approving Debtor's Assumption of Executory Contract (Merchant Processing Agreement) (the "Motion"), and the Court having reviewed the Motion and otherwise being duly advised in the premises; NOW, THEREFORE,

IT IS HEREBY ORDERED that the Motion is GRANTED, and (i) Debtor is authorized to assume the Merchant Processing Agreement with Worldpay, with the cure amount and compensation to Worldpay required under 11 USC § 365 being limited to treatment of Worldpay's Unsecured Claim as an Allowed Class 5 Claim under the Plan and (ii) Worldpay is allowed to file one or more Amended Unsecured Claims, any of which will be treated as a Class

**Page 1 of 2** – ORDER GRANTING JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

5 Claim under the Plan to the extent Allowed. No other cure payment or adequate assurance is required.

# # #

I certify that I have complied with the requirements of LBR 9021-1(a).

Presented by:

TONKON TORP LLP

By */s/*
    Timothy J. Conway, OSB No. 851752
    Michael W. Fletcher, OSB No. 010448
    Ava Schoen, OSB No. 044072
    888 SW Fifth Avenue, Suite 1600
    Portland, OR 97204-2099
    Telephone:   (503) 221-1440
    Facsimile:    (503) 274-8779
    Email:   tim.conway@tonkon.com
              michael.fletcher@tonkon.com
              ava.schoen@tonkon.com
    Attorneys for Debtor

**Page 2 of 2** – ORDER GRANTING JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11   Doc 135   Filed 05/10/24

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **DEBTOR'S AND WORLDPAY, LLC'S JOINT MOTION FOR ORDER APPROVING DEBTOR'S ASSUMPTION OF EXECUTORY CONTRACT (MERCHANT PROCESSING AGREEMENT), AS SET FORTH HEREIN** was served on Debtor and the registered parties by electronic means through the Court's Case Management/Electronic Case File system on the date set forth below.

In addition, pursuant to LBR 7007-1(c)(2), I served the following parties by e-mail on the date set forth below:

Aircraft Spruce 332
orm@aircraftspruce.com

Alpine Fastener & Hardware
accounting@alpinefastener.com

Andair Ltd
andair@andair.co.uk

Andrew J Geppert and David W Criswell on behalf of Creditor Avco Corporation
gepperta@lanepowell.com
criswelld@lanepowell.com
pinkleyl@lanepowell.com
docketing-pdx@lanepowell.com

Bandy Manufacturing 200
roger.seaman@bandymanufacturing.com

Baron Metalcrafters Limited, Alberto Rano
arano@allegromicro.com

Bild Industries, Inc.
sales@bildindustries.com

Boeing Distribution Inc. 225
tracy.l.fajarillo@boeing.com

Cronin Wood Products 302
hardison@croninwood.com

Daniel Ybarra
ybarra15@yahoo.com

Flightline Interiors 368
flightline@tds.net

Frank White on behalf of Worldpay, LLC
frank.white@agg.com

Garrett Shea Ledgerwood and R Gibson Masters on behalf of Creditor Richard E. and Diane E. Van Grunsven
Garrett.Ledgerwood@MillerNash.com
mngd-2823@millernash.com
gib.masters@millernash.com
Wendy.Jackson@MillerNash.com

Gina Hantel on behalf of Creditor TN Dept of Revenue
gina.hantel@ag.tn.gov

Hamstreet & Associates, LLC, Clyde A. Hamstreet, (re: debtor)
chamstreet@hamstreet.net
hschmidt@hamstreet.net
mcohn@hamstreet.net

Hartzell propeller 388
jstoy@hartzellprop.com

Hawkins, Parnell & Young, LLP, Rachel J. Markun, (Re: Debtor)
rmarkun@hpylaw.com

John Mason
mason270@gmail.com

Page 1 of 2 –    CERTIFICATE OF SERVICE

TONKON TORP LLP
888 SW FIFTH AVE., SUITE 1600
PORTLAND, OR 97204
503.221.1440

Case 23-62260-dwh11    Doc 135    Filed 05/10/24

| | | |
|---|---|---|
| 1 | Joseph Mason<br>mason270@gmail.com | Thomas W Stilley on behalf of Interested Party Rian Johnson and Richard VanGrunsven, Trustees of the Van's Aircraft, Inc. ESOP<br>tstilley@sussmanshank.com<br>jhume@sussmanshank.com |
| 2 | | |
| 3 | Kenneth S Eiler<br>or10@ecfcbis.com | |
| 4 | Loren S Scott on behalf of Creditor Earle M. Jorgensen Company<br>ecf@scott-law-group.com | Ted A Troutman on behalf of Creditor Warren Kemper<br>tedtroutman@gmail.com,<br>L.Rusty.Troutman@gmail.com |
| 5 | | |
| 6 | Loren S Scott on behalf of Creditor Pacific Metal Co<br>ecf@scott-law-group.com | |
| 7 | | Thomas Walters<br>tomwalters3@gmail.com |
| 8 | Loos & Co., Inc.<br>sales@loosco.com | |
| 9 | | Stein Air<br>info@steinair.com |
| 10 | Lycoming A Textron Company<br>cgayman@lycoming.com | |
| 11 | | Stephen Allcock<br>steveallcock@comcast.net |
| 12 | Matco Aircraft Landing Systems LLC<br>tech@matcoals.com | |
| 13 | | Stephen P Arnot on behalf of U.S. Trustee US Trustee, Eugene<br>steve.arnot@usdoj.gov |
| 14 | Patruska 344<br>lsanger@slackdavis.com | |
| 15 | | Usher Precision Manufacturing<br>briane@usherprecision.com |
| 16 | | |
| 17 | | US Trustee, Eugene<br>USTPRegion18.EG.ECF@usdoj.gov |

DATED: May 10, 2024.

TONKON TORP LLP

By */s/ Ava Schoen*
Timothy J. Conway, OSB No. 851752
Michael W. Fletcher, OSB No. 010448
Ava Schoen, OSB No. 044072
Attorneys for Debtor

Page 2 of 2 – CERTIFICATE OF SERVICE